## COMPTROLLER OF THE TREASURY *v.* THE GLENN L. MARTIN COMPANY

[No. 128, September Term, 1957.]

238

*Decided March 31, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Charles B. Reeves, Jr., Assistant Attorney General,* and *Edward F. Engelbert, Staff Attorney, Retail Sales Tax Division,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellant.

*William L. Marbury*, with whom were *Charles C. G. Evans, Frederic S. Cross, John Martin Jones, Jr.*, and *Piper & Marbury* on the brief, for the appellee.

A brief for the United States as *amicus curiae*, which urged that the order below be affirmed, was filed by *Charles K. Rice, Assistant Attorney General of the United States, Lee A. Jackson* and *H. Eugene Heine, Jr., Attorneys, Department of Justice, Leon H. A. Pierson, United States Attorney*, and *J. Jefferson Miller, II, Assistant United States Attorney*.

BRUNE, C. J., delivered the opinion of the Court.

This case arises out of a claim by The Glenn L. Martin Company (now known as "The Martin Company" and referred to below simply as "Martin") for the refund of Maryland sales and use taxes paid by Martin to the Comptroller on purchases of tangible personal property made by Martin during the period from March 1, 1951, through April 30, 1954, pursuant to three so-called facilities contracts between Martin and departments of the United States Government. The Comptroller denied Martin's claim for refund, Martin appealed to the Circuit Court for Baltimore County and that Court, by its order, reversed the action of the Comptroller and entered judgment for Martin in the amount of $311,539.28. The Comptroller appeals from that order. The amount of the judgment was stipulated by both parties to be correct, if Martin should be held entitled to a refund under paragraph I of its claim, and the decision of the Circuit Court was based upon contentions made in that paragraph.

The essential facts of this case are very similar to those pertaining to the Army contract involved in *Comptroller v. Aerial Products, Inc.*, 210 Md. 627, 124 A. 2d 805. Martin is a manufacturer of airplanes and parts and of missiles or special weapons for military use. As a result of the Korean War the United States wanted such articles in greater quantity than Martin's existing facilities could produce, and Martin did not have the capital resources to expand its productive capacity to meet the Government's needs. Martin and the Government accordingly entered into three contracts, in two of which the Navy was the interested Department and

in the other the Air Force, in order to supply Martin with the tools and equipment needed to produce the articles wanted by the Government. Under these contracts (referred to below as the "facilities contracts") the Government was to furnish to Martin such available tools and equipment as it had in reserve, Martin was not to procure facilities known to be so available, Martin was to purchase other facilities that might be needed, title thereto was to pass to the Government upon delivery thereof to Martin, the Government was to reimburse Martin for the cost of facilities purchased pursuant to the contract and Martin was to be permitted to use the facilities free of charge or rent in order to manufacture munitions for the Government. All articles purchased by Martin were to be tagged so as to indicate Government ownership and they were so tagged. The Government had the right at any time to remove any property to which it acquired title pursuant to the contract and in one instance, involving a milling machine valued at $200,000, it exercised this power. The Navy contracts further provided that the Government should have the right to inspect and (at least under some circumstances) to reject property purchased by Martin before payment was completed, but generally all items that were within the scope of the contracts had to be accepted, subject to provisions relating to the correction of defects, if any should exist. Provisional payments were to be made by the Government to Martin, and the Government was to have a lien for advance payments on articles contracted for or acquired under any of the facilities contracts "except to the extent that the Government, by virtue of any other provisions of this contract shall have valid title to such articles, things, materials or other property as against other creditors of the contractor." The Navy facilities contracts also contained provisions under which the Government would reimburse Martin for any sales and use taxes imposed by any state or local taxing authorities if Martin paid the same under protest and took appropriate steps to preserve any claims for refund. The Air Force contract contained a somewhat similar provision for reimbursement of "all taxes * * * properly and legally taxed, assessed or imposed upon the Contractor's interest made or created

pursuant to the provisions of this contract with respect to part or all of the facilities provided hereunder or the use thereof."

None of the facilities contracts used the words "for resale to the Government" which are found at two or more points in the Army contract involved in the *Aerial Products* case where the facilities to be acquired or purchased thereunder are spoken of as being so acquired or purchased. None of them permits Martin to make a profit on the resale of any of the facilities to the Government.

The first of the two principal questions presented in this case is whether or not the purchases of facilities made by Martin between 1951 and 1954 under the facilities contracts were subject to sales or use taxes under the provisions of Article 81 of the Code relating to such taxes as they read at the times when the purchases in question were made.

The second, which arises only if the answer to the first question is "no", is whether or not such purchases may constitutionally be subjected to sales and use taxes by amendments to Article 81 of the Code effected by Chapter 3 of the Acts of 1957, which that Act undertook to make retroactive to July 1, 1947, which was the effective date of the Sales and Use Tax Acts adopted in that year.

### Taxability Prior to January, 1957.

The Comptroller contends that the dominant purpose of Martin in making the purchases in question was to build up its own production facilities and that no purpose of the purchaser to resell the property was shown. This contention is rested heavily on the absence from the facilities contracts of the words "for resale to the Government," on the absence of any profit to Martin on sales of the facilities to the Government and on the claim that Martin could, for at least a "taxable moment," use the facilities before title passed to the Government.

The Sales Tax and Use Tax Acts are included as sub-titles in Article 81 of the Code (1951), and references below to pertinent portions of those Acts as in force during the years 1951-1954, inclusive, will be made simply by section numbers.

Section 320 (d), a part of the Sales Tax Act, defines "sale" as including "any transaction whereby title or possession, or both, of tangible personal property is * * * transferred * * * for a consideration by a vendor to a purchaser * * *." Section 320 (f) defines a "retail sale" or a "sale at retail" as including "the sale in any quantity or quantities of any tangible personal property" and states that "[S]aid term shall mean all sales of tangible personal property to any person for any purpose other than those in which the purpose, of the purchaser is to resell the property so transferred in the form in which the same is, or is to be received by him, * * *."

The Use Tax Act is complementary to the Sales Tax Act (*Comptroller v. Crofton Co.*, 198 Md. 398, 84 A. 2d 86, *Comptroller v. Thompson Trailer Corp.*, 209 Md. 490, 121 A. 2d 850). Judge Raine, in his comprehensive opinion in the Circuit Court, said in part: "The language of the Use Tax sections differs from the Sales Tax provisions, but there is nothing in the record before this Court to indicate what, if any, portion of the taxes paid are 'Use' Taxes and not 'Sales' Taxes. * * * The Comptroller concedes, and it is well established by administrative interpretation that the taxes are complementary and that the Use Tax only applies to those transactions subject to a Sales Tax, but on which no tax has been paid. Consequently, if the transactions are not subject to the Sales Tax, they are not subject to the Use Tax." To this we add the following passage from Judge Collins' opinion in the *Aerial Products* case (210 Md. 631-632): "At the argument in this Court the appellant [Comptroller] admitted that there was no evidence under which the Maryland Use Tax could be collected. The question here, therefore, involves only the Maryland Retail Sales Act."

In the present case both sales taxes and use taxes are involved, but they have been dealt with throughout the proceedings on the basis that the exclusion stated in Section 320 (f) was as applicable to use taxes as to sales taxes. This is shown by the absence of any breakdown between the two types of taxes, by the stipulation above mentioned as to the amount, if any, which Martin would be entitled to recover, by the Opinion of the Comptroller (signed by the Hearing

Officer), in which it is said that "[e]xactly this same test [whether Martin purchased the property for resale or for manufacturing its own products] should be used in determining whether or not the facilities purchased outside the State of Maryland were subject to the use tax", by the concession in the trial court above referred to, and by the absence of any argument for separate treatment in the appellant's brief.[1] On this state of the record we think that no question as to possibly different treatment for the two taxes is before us for decision. Rules 831 c 2 and 4 (relating to Contents of Briefs) and Rule 885 (relating to Scope of Review) of the Maryland Rules; *Comptroller v. Aerial Products, Inc., supra,* and cases therein cited at 210 Md. 645.

We think that the *Aerial Products* case, *supra,* and *Baltimore Foundry & Machinery Corp. v. Comptroller,* 211 Md. 316, 127 A. 2d 368, are conclusive in establishing the sufficiency of Martin's purpose to resell the facilities purchased by it to the Government to obtain the benefit of the exclusion under Section 320 (f), as in force in 1951-1954, since these cases establish the rule that under that Section the purpose of the purchaser to resell the property need not be his sole purpose in making the purchase in order to make the exclusion operative.

The absence from the facilities contracts here involved of the words "for resale to the Government" is not controlling. The contracts made it perfectly clear that title to facilities purchased by Martin was to be transferred to the Government immediately upon delivery of the equipment to Martin, and the Government became obligated to reimburse Martin for the cost thereof. The right of rejection reserved under the Navy contracts, the precise scope of which is somewhat

---

1. Counsel for the appellant did point out in rebuttal argument that the Use Tax Act definition of "use" in Sec. 368 (d)(1) excludes sales by vendors "in the regular course of business." It does not employ the phrase found in Sec. 320 (f) of the Sales Tax Act dealing with sales "in which the purpose of the purchaser is to resell * * *." Cf. *Comptroller v. Crofton Co., supra.* Sec. 370 (c) of the Use Tax Act carries over exemptions under Sec. 322 of the Sales Tax Act.

obscure, still would not detract from Martin's purpose to re-sell to the Government, nor would it prevent the passage of title to the Government when the equipment was delivered to Martin.

Likewise, in view of this provision for the immediate pas-sage of title to the Government upon delivery of the equip-ment to Martin, there was no moment at which Martin could use the equipment prior to the passage of title. Even if there had been such an interval of time, the result would not have been altered. See *Baltimore Foundry & Machinery Corp. v. Comptroller, supra,* where the fact that some time might elapse between the purchase of a pattern by the foundry and its resale to the customer did not change the result.

The appellant urges that the absence of any profit to Martin on the resale of equipment to the Government mani-fests a lack of genuine purpose to resell. We think that this does not follow. In the *Baltimore Foundry* case, the expec-tation or realization of a profit on resale was regarded as a factor indicating that a genuine resale was intended, but there was no possibility of a profit to the contractor on resale under the Army contract in the *Aerial Products* case. In the latter case, as in this, the contract provided for resale to the Government at cost.

## The Retroactive Amendments.

The opinions in the *Aerial Products* and *Baltimore Foundry* cases were filed, respectively, on July 30, and December 6, 1956. The next session of the General Assembly held there-after opened in January, 1957, and one of the first bills en-acted became Chapter 3 of the Acts of 1957, approved on January 28th of that year. This Act was declared (by Sec-tion 5 thereof) to be an emergency measure and it was there-fore stated to take effect from the date of its passage. In one sense this declaration as to the effective date was an understatement, since the Act undertook to amend certain provisions of the Sales and Use Tax Acts as of July 1, *1947.* There is no question that this enactment was a direct conse-quence of the *Aerial Products* and *Baltimore Foundry* de-

cisions and was intended to bring about an opposite result in similar cases, past as well as future.

The Act contains three recital clauses. These, so far as here relevant, say that "it is and has always been the intent of the General Assembly * * * that the definition of 'Retail Sale' and 'Sale at Retail' should include all sales, except sales in which the *sole purpose* of the purchaser *is to resell* the tangible personal property * * *"; that "the definition of 'Use' in the Maryland Use Tax should exclude only such property * * * which is held *solely for resale in the regular course of business* * * *"; and that "the uniform administrative interpretation and enforcement by the Comptroller * * * since the inception of the Retail Sales Tax Act and the Maryland Use Tax has been in conformity with the provisions of this ACT * * *." (Italics supplied.) The word "ACT" was substituted for the word "amendment" as the last word in the above quotation by an amendment made while the bill was under consideration by the Legislature. These recitals do not constitute a part of the actual enactments made by the statute. *Hammond v. Frankfeld,* 194 Md. 487, 71 A. 2d 482; *Gibson v. State,* 204 Md. 423, 104 A. 2d 800. They do not in terms state the law to have been otherwise than as this Court determined it to be in the *Aerial Products* and *Baltimore Foundry* cases; and if they had undertaken to do so, they would, to that extent, have encountered an insurmountable constitutional obstacle to their validity. Md. Declaration of Rights, Art. 8; *Crane v. Meginnis,* 1 Gill & J. 463, 476; *Baltimore v. Horn,* 26 Md. 194; *Marburg v. Mercantile Bldg. Co.,* 154 Md. 438, 140 A. 836; *Montgomery County v. Bigelow,* 196 Md. 413, 77 A. 2d 164.

We turn then to the operative provisions of Chapter 3 of the Acts of 1957. The first section added to the Sales Tax Act a new paragraph of sub-section (f) of Section 320, designated as (6). The second section of the Act amended the definition of "use" in Section 368 (d), which is a part of the Use Tax Act. Each of these sections was enacted as "effective July 1, 1947." The third section of the Act exempted any person from criminal prosecution or penalties "because of any violation of the provisions of these sections which oc-

curred prior to the passage of this Act." ("These sections" are not identified, but presumably mean Section 320 (f) (6) and 368 (d) as added or amended by Chapter 3, Acts of 1957.) Section 3 was evidently intended in part to avoid making the Act an *ex post facto* statute. It also states that the Act shall not render taxable any sale or use which was exempt from taxation under the expressed terms of Section 322 or Section 370. (In the *Baltimore Foundry* case, the sales of patterns to the Foundry Corporation were held to be excluded from taxability under Section 321 by the definition of "retail sale" or "sale at retail" contained in Section 320 (f) and not by reason of an exemption under Section 322. See 211 Md. at 319.) The fourth section of Chapter 3 of the Acts of 1957 is a separability clause, and the fifth section (as already noted) is the emergency measure clause.

Section 320 (f), as amended by Chapter 3 of the Acts of 1957, so far as here material, reads as follows: "For the purpose of the tax imposed by this subtitle, the term 'sale at retail' shall include but shall not be limited to the following: * * * (6) Sales of tangible personal property * * * to any person who will use the same as facilities, tools, tooling, machinery or equipment (including, but not limited to dies, molds and patterns) even though such person intends to transfer and/or does transfer title to such property or service either before or after such person uses the facilities, tools, tooling, machinery or equipment." Then follows a provision exempting from taxation a resale, pursuant to a contract, made at a price not less than the cost to the purchaser-reseller of the property acquired in a transaction declared taxable by the quoted portion of paragraph (6).

The principal amendment to Section 368 (d) was the addition of this sentence to the definition of the term "use": "This term shall also include but not be limited to use of facilities, tools, tooling, machinery or equipment (including, but not limited to dies, molds and patterns) by a purchaser thereof even though he transfers title to another either before or after use by him and without regard to whether title is transferred to the other within or without this State."

Obviously these provisions are intended to cover just the

kinds of transactions here involved, and equally obviously they are retroactive. The question is: Are they valid?

Both Article 23 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States are invoked by the appellee against the validity of Chapter 3 of the Acts of 1957. Since that Act was passed after this case had been submitted to the Circuit Court on appeal from the Comptroller's action, the question as to the validity of the Act was raised by amendment of the appellee's original petition with regard to the questions of law presented.

It is well established that a tax is not necessarily invalid simply because it is retroactive. See *Diamond Match Co. v. State Tax Comm.*, 175 Md. 234, 200 A. 365, and the exhaustive review of authorities therein contained; *Leser v. Wagner*, 120 Md. 671, 87 A. 1040, affd. *sub nom.; Wagner v. Baltimore*, 239 U. S. 207; *Welch v. Henry*, 305 U. S. 134; to cite only a few of many cases. There are, however, a number of cases in which retroactive taxes have been held invalid as violative of due process, to some of which we shall refer below. The problem is the familiar one in due process cases as to where the line should be drawn. It is not easy of solution, and it is difficult, if not impossible, to deduce a clear line of demarcation applicable to all cases.

The question of the validity of retroactive tax laws has arisen in a variety of circumstances and has been met in several different ways.

We may first note the so called ratification cases, among which *United States v. Heinszen & Co.*, 206 U. S. 370, is probably the leading case. It upheld an Act of Congress which validated customs duties previously imposed under Presidential, rather than Congressional, authority. Other Supreme Court decisions had established the lack of power to impose such duties without the authorization of Congress. The case was rested squarely upon ratification of the acts of an agent done without prior authority from the principal. The *Heinszen* case was followed in *Tiaco v. Forbes*, 228 U. S. 549, and in *Rafferty v. Smith, Bell & Co.*, 257 U. S. 226. In *Tiaco v. Forbes*, 228 U. S. at 556, Mr. Justice

Holmes thus stated the ratification doctrine: "[I]t generally is recognized that * * * where the act originally purports to be done in the name and by the authority of the state, a defect in that authority may be cured by the subsequent adoption of the act. The person who has assumed to represent the will and person of the superior power is given the benefit of the representation if it turns out that his assumption was correct. [Cases cited.]"

But the doctrine is not without limitations, as was held in *Forbes Pioneer Boat Line v. Board of Commissioners,* 258 U. S. 338. There the plaintiff boat line sued to recover tolls charged by the defendant board for the use of a canal lock made in or prior to 1917. At that time the Board had no power to impose such charges. As the report of the original case below, (77 Fla. 742) shows, the canal and lock were parts of a drainage system which the Board was authorized to construct and maintain, and the statute imposed taxes on lands within the drainage district to cover the expenses of the Board in the construction and maintenance of the system, but it said nothing whatever about tolls for use of the canal or locks. In 1919 the Florida Supreme Court upheld the plaintiff's declaration, and on the very day that it did so. the Florida Legislature passed an act to validate the collection of tolls. The Florida Supreme Court later upheld this act, basing its decision on the *Heinszen* case. The Supreme Court of the United States reversed the judgment. The opinion, also written by Mr. Justice Holmes, said in part: "Stripped of conciliatory phrases the question is whether a state legislature can take away from a private party a right to recover money that is due when the act is passed. The argument that prevailed below was based on the supposed analogy of *United States v. Heinszen & Co.,* 206 U. S. 370, (*Rafferty v. Smith, Bell & Co.,* 257 U. S. 226,) which held that Congress could ratify the collection of a tax that had been made without authority of law. That analogy, however, fails. A tax may be imposed in respect of past benefits, so that if instead of calling it a ratification Congress had purported to impose the tax for the first time the enactment would have been within its power. *Wagner v. Baltimore,*

239 U. S. 207, 216, 217. *Stockdale v. Atlantic Insurance Co.,* 20 Wall. 323. But generally ratification of an act is not good if attempted at a time when the ratifying authority could not lawfully do the act. * * * If we apply that principle this statute is invalid. For if the Legislature of Florida had attempted to make the plaintiff pay in 1919 for passages through the lock of a canal, that took place before 1917, without any promise of reward, there is nothing in the case as it stands to indicate that it could have done so any more effectively than it could have made a man pay a baker for a gratuitous deposit of rolls." (258 U. S. at 339.)

We think that under the *Forbes Pioneer Boat Line* case the application of the doctrine of ratification would not be supportable, even if there were a clear legislative ratification; but we also think that any actual ratification is lacking. The nearest approach to it that we have in the instant case is contained in the preambles to Chapter 3 of the Acts of 1957, and, as we have noted, the preambles are not operative parts of the statute. On the contrary, the pertinent operative parts of that Act undertake retroactively to add a clause to the Retail Sales Tax Act and to amend a provision of the Use Tax Act. These changes, we think, constitute new enactments rather than ratifications.

Taxes for past benefits have been upheld by the Supreme Court and by this Court. *Seattle v. Kelleher,* 195 U. S. 351; *Baltimore v. Ulman,* 79 Md. 469, 30 A. 43; *Leser v. Wagner* and *Wagner v. Baltimore, supra; Washington Suburban Sanitary Comm. v. Noel,* 155 Md. 427, 142 A. 634. See also *Leonardo v. County Commrs.,* 214 Md. 287, 134 A. 2d 284. A retroactive tax on property omitted from the tax rolls was upheld in *Winona & St. Peter Land Co. v. Minnesota,* 159 U. S. 526. Such cases do not seem to be in point in the present controversy.

There have been a number of estate, inheritance and gift tax cases in which the question of retroactivity has been involved.

*Nichols v. Coolidge,* 274 U. S. 531, held unconstitutional the imposition of the Federal estate tax under the Revenue Act of 1919, Sec. 402 (c), upon the estate of a decedent who

died in 1921 in respect of property transferred under an irrevocable trust made in 1907, under which the decedent, Mrs. Coolidge, and her husband, the settlers, retained a life interest which they assigned to other beneficiaries under the trust in 1917.[2]  (The Federal Estate Tax Act of September 8, 1916, had been held in *Shwab v. Doyle*, 258 U. S. 529, to apply only to transfers subsequently made.)  The Act of 1919 was clearly intended to include prior as well as subsequent transfers made in contemplation of death or intended to take effect at or after death in calculating the gross estate for tax purposes.  The opinion held that "the statute here under consideration, in so far as it requires that there shall be included in the gross estate the value of property transferred by a decedent prior to its passage merely because the conveyance was intended to take effect in possession or enjoyment at or after his death, is arbitrary, capricious and amounts to confiscation."  274 U. S. at 543.  Justices Holmes, Brandeis, Sanford and Stone concurred in the result.  They filed no separate opinion.

In *Coolidge v. Long*, 282 U. S. 582, which was more or less a companion case to *Nichols v. Coolidge, supra,* Massachusetts sought to impose a tax under a 1921 statute upon the same trust property involved in the *Nichols* case on the death of Mr. Coolidge, which occurred in 1925.  The Supreme Judicial Court of Massachusetts upheld the tax (268 Mass. 443, 167 N. E. 757), but the Supreme Court of the United States held it invalid.  The latter Court noted that the 1907 transfer antedated any statute imposing a tax upon succession to the property, and the majority opinion held that the rights of beneficiaries under the trust had so far vested prior to the taking effect of the tax statute that there was thereafter no occasion in respect of which the excise might constitutionally be imposed.[3]

In *Milliken v. United States,* 283 U. S. 15, the Supreme Court upheld the applicability of the rates of the Federal

---

2. Other transfers which were held to be absolute gifts are not material here.

3. See also *Helvering v. Helmholz,* 296 U. S. 93, and *White v. Poor,* 296 U. S. 98.

estate tax prescribed by the Revenue Act of 1918 to a gift made in contemplation of death in December, 1916, by a donor who died in 1920. The Revenue Act of 1916, which was in force when the gift was made, made such a gift includible in the gross estate of a decedent, but the rate of taxation was lower. In upholding the application of the tax at the rates fixed by the 1918 Act, the Court emphasized the policy, already manifested by the 1916 Act, of taxing at the same rate property transferred by testamentary disposition and property transferred by a substitute for such disposition. An increase in rates in accordance with such a policy adopted between the date of a gift and the date of the donor's death, is, of course, quite different from the imposition of a tax upon a transaction which was not subject to any tax when consummated.

*Blodgett v. Holden,* 275 U. S. 142, 147 (1927), and *Untermyer v. Anderson,* 276 U. S. 440, 445 (1928), involved the newly enacted gift tax, embodied in the Revenue Act of 1924, which was approved June 2, 1924. The Act purported to tax all transfers of property by gift made in the calendar year 1924. The two cases held respectively that the retroactive effect of the act constituted a denial of due process and was therefore invalid (1) in the case of the first taxpayer who in January of 1924 had made his gift even before the Act had been submitted to Congress, and (2) in the case of the second taxpayer who had made a transfer by gift on May 23, 1924, some three months after the provisions of the Act had been first presented to Congress and while the conference report upon the bill was pending.

Questions of retroactivity have also arisen in income tax cases.

In *Brushaber v. Union Pacific R. Co.,* 240 U. S. 1, the Federal income tax imposed by the Act of October 3, 1913, was held valid as to income arising on and after March 1, 1913, that date being subsequent to the effective date of the Sixteenth (Income Tax) Amendment. In *Lynch v. Hornby,* 247 U. S. 339, the Income Tax of 1913 was held valid as to dividends paid by a corporation to its stockholders after

March 1, 1913, whether paid out of current earnings or from surplus accumulated before that date.

*Welch v. Henry*, 305 U. S. 134, referred to above, involved a retroactive income tax imposed by a Wisconsin statute enacted on March 27, 1935, applicable to dividends received in the year 1933, which, at the time of receipt, were deductible from gross income. The statute was upheld over an objection based upon the Due Process Clause of the Fourteenth Amendment. Like the Maryland franchise tax which this Court upheld in the *Diamond Match Co.* case, *supra*, this Wisconsin tax was designed to meet the emergency created by the post-1929 depression. It is clear from the majority opinion (written by Mr. Justice Stone) that the Court recognized that there was some limit in time beyond which a statute could not operate retroactively consistently with due process. The Court stated (p. 149): "We cannot say * * * that in view of well established legislative practice, both state and national, taxpayers can justly assert surprise or complain of arbitrary action in the retroactive apportionment of tax burdens to income *at the first opportunity after knowledge of the nature and amount of the income is available*. And we think that the 'recent transactions' to which this Court has declared a tax law may be retroactively applied. *Cooper v. United States,* 280 U. S. 409, 411, must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment." (Emphasis supplied.) The last sentence of the opinion (p. 151) also significantly states: "While the Supreme Court of Wisconsin thought that the present tax might 'approach or reach the limit of permissible retroactivity,' we cannot say that it exceeds it."

The principle that there may exist a time period beyond which a statute may not constitutionally be given retroactive effect is implicit also in *Cooper v. United States,* 280 U. S. 409, cited in *Welch v. Henry*. There, in upholding a statute retroactively changing the basis of property acquired by gift after a certain date, the Court said (at p. 411): "That the questioned provision can not be declared in conflict with the Federal Constitution merely because it requires gains from prior but recent transactions to be treated as part of the tax-

payer's gross income has not been open to serious doubt since *Brushaber v. Union Pacific R. Co.,* 240 U. S. 1, and *Lynch v. Hornby,* 247 U. S. 339."

The limited period of retroactive taxation imposed by the Silver Purchase Act of 1934 was emphasized in *United States v. Hudson,* 299 U. S. 498, and appeared to be persuasive to the Supreme Court, which affirmed the validity of the tax against due process objections.

There are numerous cases cited in *Welch v. Henry, supra,* which reject the contention that the particular retroactive application of a revenue act constitutes a denial of due process. It is significant, however, that all these cases deal with tax laws which were retroactive for very limited periods of time, and nowhere in any of them do we find advanced the theory that the legislative power to tax retroactively is unlimited in the sense that any period in the past may be reached. *Welch v. Henry* holds essentially that the period of retroactivity in that case did not exceed the permissible time limit. How far this limit extends was not defined by the Supreme Court in that case, or in any subsequent case to date. However, several state courts have considered the problem and have refused to extend the permissible time period of retroactivity beyond that sanctioned in *Welch v. Henry.*

*People v. Graves,* 280 N. Y. 405, 21 N. E. 2d 371 (1939), by a 4-3 decision struck down a 1935 amendment of a state income tax statute authorizing the retroactive taxation of income from foreign realty for a period of sixteen years in the past. In citing *Welch v. Henry, supra,* the court noted that the Wisconsin court in the state appeal of that case had observed that while the tax there involved might "approach or reach the limit of permissible retroactivity," it did not exceed it. A majority of the New York court showed no inclination to increase the scope of "permissible retroactivity."

In *Lacidem Realty Corp. v. Graves,* 288 N. Y. 354, 43 N. E. 2d 440 (1942), as in this case, an amendment of a tax law was enacted as effective as of the original effective date of the tax. That date was about four years earlier. The amendment sought to subject a new and different class of persons to a tax on sales of electricity. All of the judges held

this retroactive amendment invalid. By a 4-3 division an alternative tax retroactive for less than seventeen months (to take effect if the four-year period were held invalid) was upheld under the "prior but recent transactions" cases.

In *Commonwealth v. Budd Co.,* 379 Pa. 159, 108 A. 2d 563, it was held that the 1947 state corporate net income tax act which prohibited the deduction from 1944 net income of carry-back losses sustained in 1946 (allowed under the prior law) was violative of due process and therefore invalid. The Court stated (p. 568): "It is obvious, however, that there must be some limitation on the right of a legislative body to pass laws imposing taxes retroactively, for otherwise a legislature could constitutionally impose new or increased taxes retroactively for a period of 25 or 50 years which would be so onerous or confiscatory and unjust as to bankrupt the individuals or corporations thus taxed. This was recognized in *Welch v. Henry* * * *. Following *Welch v. Henry,* we decide that a tax may not be retroactively applied beyond the year of the general legislative session *immediately preceding that of its enactment;* to provide otherwise constitutes a denial of due process."

See also *Wheeler v. Commissioner of Internal Revenue,* 143 F. 2d 162 (9th Cir., 1944), where it was held that Section 501 (a) of the Second Revenue Act of 1940 relating to computation of earnings and profits of a corporation could not be retroactively applied in the case of a personal holding company's liquidation which had been completed in 1938 under the Revenue Act of 1938. *Welch v. Henry, supra,* was considered at length and the Court concluded (p. 168): "* * * the courts have held that there is a point of time when such retroactivity is beyond the legislative power. The rule that such amendment to legislation must come within the next session of the legislature or within a reasonable length of time as analyzed in the *Welch v. Henry* case * * * is the sounder law." The court held that the 1940 Act went beyond the scope of "permissible retroactivity" and accordingly held for the taxpayer. This decision was reversed by the Supreme Court in 324 U. S. 542, but is still persuasive, since the basis of reversal did not concern the question of retroactivity. The

Supreme Court held that the method of determining "earnings and profits" proposed by the Commissioner was in fact required by the *1938* Act, and hence that no retroactive application of the 1940 Act was involved in the case.

The Comptroller relies upon *Wilgard Realty Co. v. Commr. of Internal Revenue,* 127 F. 2d 514 (2d Cir., 1942), cert. den., 317 U. S. 655. In that case the owner of certain real property conveyed it to a corporation (the taxpayer) in 1932 in exchange for all or substantially all of its stock and the assumption by the corporation of the transferor's indebtedness secured by mortgages on the real estate. The transferor gave to relatives 80% of the stock, nearly all of it immediately after the exchange. The real estate was sold in 1937 and the corporation was then liquidated. It appears that all parties treated the 1932 exchange as tax-free; but in 1938 the Supreme Court held in *United States v. Hendler,* 303 U. S. 564, that such an exchange was not tax-free because of the assumption of liability of the transferor by the transferee. This decision was followed by the Revenue Act of 1939, § 213 (f) (1) of which was passed to do away with the effect of the Hendler decision and by its terms it was retroactive. The Commissioner contended that it should be given such effect and that the cost basis of the property to the Wilgard Realty Company should accordingly be that of its transferor at the time of the transfer and that such basis should be used in determining gain or loss on the sale made in 1937. The court upheld his contention and held the 1939 statute effective retroactively to 1932. The court stated the determinative question in the *Wilgard* case in this way: "The decisive test in this instance is whether this taxpayer has had its expectations as to taxation unreasonably disappointed." The court adopted the view that in 1932 neither the taxpayer nor its controlling stockholder thought that the assumption of indebtedness gave rise to gain or loss or affected the corporation's tax basis and that the 1939 amendment of the law merely validated the method which both parties to the 1932 exchange used in reporting the effect of that transaction. The court then held that the taxpayer had done nothing which it would not have done if the law had

been in 1932 just what the 1939 amendment had made it, and that it had, "therefore, not been the victim of any injustice and until it can show that it has been hurt it may not challenge the constitutionality of the statute."

Perhaps the *Wilgard* case actually holds no more than that if a taxpayer comes out taxwise exactly where he expected to as a result of a transaction which he entered into voluntarily, he has no constitutional ground for complaint if that result is achieved through retroactive legislation. Perhaps the case goes further, and at some points it seems to us that it does. At one of these points (127 F. 2d 517) the court said that "retroactive taxation is not so arbitrary and oppressive as to be unconstitutional if it is no more burdensome than the taxpayer should have expected it to be when he did the thing which created the tax liability." This statement appears to presuppose a double gift of foresight on the part of the taxpayer: First, he must foresee that retroactive legislation may impose a tax upon a transaction which is not subjected to taxation when consummated; second, he must be able to estimate how much of a burden will be imposed. In cases such as *United States v. Hudson, supra*, 299 U. S. 498, involving a tax imposed by the Silver Purchase Act of June 19, 1934, and made retroactive to May 15, 1934, on profits derived from transfers of silver bullion, such prescience on the part of a taxpayer may reasonably be assumed. The facts that such a tax had been publicly advocated for some months, that the imposition of such a tax was recommended by the President in a message to Congress on May 22nd and that the bill which became the Silver Purchase Act was introduced on May 23rd, 1934, were all taken into account by the Supreme Court in upholding the brief period of retroactivity provided for by that Act. There was adequate forewarning.

In different circumstances, and probably in most, however, a test based upon what the taxpayer should have anticipated, seems to us to involve so many uncertainties that we should not be willing to adopt or rely upon it as a rule of general applicability.

If we approach the *Wilgard* case as standing for the rather narrow rule first suggested—that the taxpayer cannot com-

plain of retroactive legislation which gives him exactly what he expected—we find substantial differences between the *Wilgard* case and the present case. Though Martin and the Government evidently contemplated the possibility that sales or use taxes might be claimed to be due, it is also clear that they inserted provisions in the facilities contracts designed to avoid incurring such taxes, that they contemplated contesting the validity of such taxes if claims therefor were asserted, and that from the outset they denied any liability therefor. We find nothing to indicate any anticipation of retroactive taxes. We may add that we find no real analogy between this case, where the Government and a prime contractor were working out arrangements for the production of munitions of war during actual hostilities, and a case such as *Milliken v. United States, supra,* 283 U. S. 15 (extensively relied on in the *Wilgard* case), in which a donor made a gift in contemplation of death, knowing at the time of the statutory policy to include such gifts in the gross estate of a decedent and to tax them at the same rates as testamentary dispositions.

Mr. Justice Holmes pointed out in the *Forbes Pioneer Boat Line* case, *supra,* that by varying circumlocutions the courts have tended to uphold retroactive tax statutes which cured more or less technical defects; but he concluded that same opinion (258 U. S. at 340) by saying: "It would seem from the first decision of the Court below that the transaction was not one for which payment naturally could have been expected. To say that the legislature simply was establishing the situation as both parties knew from the beginning it ought to be would be putting something of a gloss upon the facts. We must assume that the plaintiff went through the canal relying upon its legal rights and it is not to be deprived of them because the Legislature forgot."

This reasoning, we think, is applicable in the instant case. The Sales Tax Act as we have construed it in the *Aerial Products* and *Baltimore Foundry* cases did not tax a sale in which it was the purpose, even though not the sole purpose, of the purchaser to transfer title. Without "putting something of a gloss upon the facts" we could not say that the

1957 Act established "the situation as both parties knew from the beginning it ought to be."

On the case as presented, we think that Chapter 3 of the Acts of 1957 seeks to place a tax where none was imposed before and to reach transactions completed long before its enactment. In *Jones v. Gordy*, 169 Md. 173, 180 A. 272, this Court held the 1935 Emergency Gross Receipts Tax not to be applicable to receipts coming into the hands of the seller after the passage of the Act imposing the tax which were derived from sales consummated prior to its passage. The tax, by its terms, was a license tax on the privilege of engaging in business to be measured by the receipts from sales. Chief Judge Bond said (169 Md. at 182): "An intention to license business already engaged in previously might of itself be considered so illogical and unreasonable as to be doubtful." One of the bases for the construction of the Act adopted by the Court was to avoid such a constitutional doubt. The question of constitutionality was not decided, but it is evident that the Court considered the question a serious one.

The instant case does not, in our estimation, fall within any of the usual types of cases in which retroactive taxing statutes have been upheld. It is not within the "ratification" cases, for there is no ratification; it is not within the group of cases which have upheld the correction of technical defects; and it is not within the "recent transactions" cases, because the reach of the statute is too great in point of time —three to six years on the facts of this case. The statute seeks to tax transactions completed long before the tax was in existence. On the facts of this case and on the contentions submitted to us, we are of the opinion that the retroactive application of Chapter 3 of the Acts of 1957 would be in conflict with Article 23 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.

In view of this conclusion none of the other questions presented calls for determination, and we find no occasion at this time to consider the effect of the recent decisions of the Supreme Court in the cases of *Detroit v. Murray Corpo-*

*ration,* 355 U. S. 489 (two cases, Nos. 18 and 36, Oct. Term, 1957), *United States v. Muskegon,* 355 U. S. 484 (two cases Nos. 37 and 38, same Term), and *United States and Borg-Warner Corp v. Detroit,* 355 U. S. 466 (No. 26, same Term), all decided March 3, 1958, with regard to various claims advanced by or on behalf of Martin or the United States.

*Order affirmed, with costs.*