KATZENBERG ET AL. *v.* COMPTROLLER OF
THE TREASURY OF THE STATE OF
MARYLAND

[No. 25, September Term, 1971.]

*Decided October 18, 1971.*

190

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*George W. Liebmann,* with whom was *Shale D. Stiller* on the brief, for appellants.

*Jon F. Oster, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

The appellants here challenge the validity of certain portions of Chapter 142 of the Laws of 1967, Maryland Code (1957, 1969 Repl. Vol.) Art. 81, §§ 279-283, 287-289, 323-323A (the Act), which substantially revised Maryland's income tax law. While the Act became effective 1 July 1967, it was, by its terms, applicable to income received after 31 December 1966.

Maryland had imposed income taxes in a desultory fashion from 1777 through 1779 and from 1841 until 1849, but had no general income tax again until the enactment of Chapter 11, § 8 of the Laws of 1937 (Special Session) (the 1937 Act), Cairns, *History and Constitutionality of the Maryland Income Tax Law,* 2 Md. L.

Rev. 1 (1937). The tax imposed by the 1937 Act was classified (*i.e.*, not graduated), but later amendments taxed earned and investment income at different rates. Broadly speaking, the 1937 Act set up a scheme of exemptions, exclusions, and deductions which was similar to, but not identical with, that contained in the Internal Revenue Code. Although originally only gains from the disposition of property held more than two years were exempt, generally speaking, capital gains were not taxed as such by the 1937 Act, nor was the deduction of capital losses permitted, Carter, *A Survey of the Maryland Income Tax Law*, 2 Md. L. Rev. 11 (1937). Although the 1937 Act was modified and amended from time to time, the basic philosophy of the 1937 Act persisted until 1967.

Chapter 142 of the Laws of 1967 completely restructured Maryland's income tax law, by adopting as a base for State income tax purposes the adjusted gross income of an individual taxpayer (§ 280 (a)) and the taxable income of a corporate taxpayer (§ 280A), as determined under the Internal Revenue Code, to and from which certain amounts, as specified by the Act, are to be added or deducted. On the resulting figure, § 288 of the Act imposes a graduated tax ranging from 2% to 5% for individuals, and a non-graduated tax for corporations. The scheme of exemptions, exclusions and deductions contained in the 1937 Act, as amended, was retained with modifications.

For the purposes of this opinion, the important change brought about by the Act was that for the first time capital gains and losses were brought within the ambit of the State income tax. This is so because gains and losses are reflected in the adjusted gross income of an individual and the taxable income of a corporation developed for federal tax purposes, to which the Maryland tax is applied.

The appellants here are Morton C. Katzenberg and Dena S. Katzenberg, his wife, and David M. Katzenberg

and Steven A. Katzenberg, their sons, sometimes referred to collectively hereafter as "the Katzenbergs". In 1962, the Katzenbergs, each of whom owned shares of the capital stock of The Farboil Company (Farboil), entered into agreements with Farboil under which their stock was sold to that company for a consideration consisting of promissory notes payable in 25 equal annual installments with interest at 4%, or similar notes with interest at 5% and cash, as follows:

|  | Notes | Cash |
|---|---|---|
| Morton C. Katzenberg | $107,441.71 | —— |
| Dena S. Katzenberg | 215,851.37 | —— |
| David M. Katzenberg | 53,519.80 | $2,229.99 |
| Steven A. Katzenberg | 47,759.80 | 1,989.99 |

In 1963, Morton C. Katzenberg entered into an agreement for the sale of all stock of The Haven Chemical Company (Haven) owned by him, for which he received two notes payable in 10 equal installments with interest at 4%, totaling $47,277.16.

In 1964, Dena S. Katzenberg sold her one-third interest in the co-partnership known as Quail Realty (Quail) to the two remaining partners, for which she received the partners' promissory note for $63,126.47, due one year from date with interest at 5½%.

It would appear to be conceded that each of these transactions was designed to qualify for installment sale treatment under § 453 of the Internal Revenue Code, but that because Mr. and Mrs. Katzenberg were in high federal income tax brackets, they derived no tax benefit from such treatment, and that only minimal benefits were enjoyed by their two sons. All of them did, however, achieve the advantage of postponing payment of the capital gains tax until there were funds in hand from which it could be paid.

It was what happened later that gave rise to this controversy:

*Farboil.* Farboil paid the installments due on its notes

in 1963, 1964, 1965, 1966 and 1967. As a result of the acquisition of Farboil by another company in 1968, the unpaid principal balances, by the terms of the notes, became due and payable, and the capital gains attributable to the amounts received by the four Katzenbergs were reflected in their 1968 federal income tax returns.

*Haven.* Haven paid the installments due on its notes in 1964, 1965, 1966 and 1967. By agreement, the payment of the unpaid principal balance was accelerated in 1968, and of the amount received in that year, the sum of $39,835 was reflected as a capital gain in the joint federal tax return of Morton C. and Dena S. Katzenberg.

*Quail.* Payments in reduction of the Quail note were made in 1964, 1965 and 1966. In 1967 the unpaid balance of $20,000 and accrued interest was paid to Mrs. Katzenberg and the portion of this payment representing capital gain was reflected in the joint 1967 federal tax return of Morton C. and Dena S. Katzenberg.

As a consequence of the recognition of the capital gains for federal income tax purposes in 1967 and 1968, the Katzenbergs incurred Maryland income tax liabilities in those years, aggregating $15,085.00, as follows:

|  | *1967* | *1968* |
|---|---|---|
| Morton C. and Dena S. Katzenberg | $625.00 | $11,953.00 |
| David M. Katzenberg | 35.00 | 1,241.00 |
| Steven A. Katzenberg | 34.00 | 1,197.00 |
|  | $694.00 | $14,391.00 |

It was these amounts, together with interest at 6% from 15 April 1968 and 1969, which were the subject of claims for refund, filed with the State Comptroller. When the claims were denied, the Katzenbergs appealed to the Maryland Tax Court, which affirmed the Comptroller. An appeal was taken to the Baltimore City Court, and from an order of that court affirming the action of the tax court, this appeal was taken.

The Katzenbergs advance five reasons why the order of the Baltimore City Court should be reversed:

"1. The application of the 1967 capital gains tax act to payments under installment agreements entered into years before its consideration and effectiveness is invalid by reason of the excessive backward reach of the tax and by reason of the inapplicability of all of the recognized exceptions to the constitutional rule of nonretroactivity.

"2. The retroactive application of the tax to these taxpayers is unconstitutionally arbitrary insofar as it makes Maryland tax liability depend on exercise of optional reporting methods, years previously, under a different taxing scheme, rather than on the substance of transactions.

"3. The application of the tax is invalid and unconstitutional by reason of the fact that it is made to fall upon capital gains accruing during periods beginning in 1932, 1952, and 1951 and ending in 1962, 1963, and 1964 and fully realized by receipt of full and alienable consideration in the form of notes years prior to consideration and enactment of the tax.

"4. A graduated retroactive capital gains tax with exceptions is a direct tax on property subject to and contravening the uniformity provisions of Article 15 of the Maryland Declaration of Rights.

"5. The adoption by the 1967 Act of principles of construction applicable to the federal income tax law as well as the principle that statutes are to be construed to avoid constitutional problems require that Chapter 142 be held inapplicable to the transactions in suit."

Before considering these contentions, *seriatim,* it might be helpful to recall certain basic principles. Traditionally, state income tax laws have been attacked on the ground that they failed to respond to the constitutional mandates of equality or uniformity, Cairns, *supra* at 5. This has been most recently exemplified by the result reached by the Supreme Court of Pennsylvania in *Amidon v. Kane,* 444 Pa. 38, 279 A. 2d 53 (1971) which struck down the individual income tax imposed by Arti-

cle III of the Commonwealth's Tax Reform Code of 1971, Act No. 2, 72 P.S. § 7107 *et seq.*, largely because it was violative of the requirement contained in Art. VIII, § 1 of the Constitution of Pennsylvania that "[a]ll taxes be uniform, upon the same class of subjects, * * *" following *Saulsbury v. Bethlehem Steel Co.*, 413 Pa. 316, 196 A. 2d 364 (1964) and *Kelley v. Kalodner*, 320 Pa. 180, 181 A. 598 (1935).[1]

The rub comes from the fact that not every constitutional mandate of uniformity applies to *all* taxes, 1 Cooley, *The Law of Taxation* § 267 (4th ed. 1924).

The controlling provision in Maryland is found in Article 15 of the Declaration of Rights:

> "That the levying of taxes by the poll is grievous and oppressive and ought to be prohibited; that paupers ought not to be assessed for the support of the government; that the General Assembly shall, by uniform rules, provide for the separate assessment, classification and subclassification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community." [2]

---

1. Pennsylvania's corporate net income tax had been held to be a constitutional excise tax in *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, 184 A. 37 (1936).

2. It is interesting to note that at the time of the enactment of Maryland's income tax law in 1937, there were apprehensions that Article 15 might preclude the imposition of a graduated income tax. Chapter 525 of the Laws of 1937 submitted a constitutional

Whatever doubts may have existed in respect to the scope of the uniformity requirement of Article 15 have long been resolved by the cases holding that the requirement of uniformity is directed at property taxes, and that an income tax is not a property tax, *Rafferty v. Comptroller,* 228 Md. 153, 161, 178 A. 2d 896 (1962); *Oursler v. Tawes,* 178 Md. 471, 13 A. 2d 763 (1940); *Tyson v. State,* 28 Md. 577 (1868).

It seems equally well settled that exemptions, made for a public purpose and uniformly applied, are permissible under Article 15. *Compare Murray v. Comptroller of the Treasury,* 241 Md. 383, 216 A. 2d 897 (1966) and *Wells v. Commissioners of Hyattsville,* 77 Md. 125, 26 A. 357 (1893) *with Baltimore v. Starr Methodist Protestant Church,* 106 Md. 281, 67 A. 261 (1907). Similarly, the requirement of equality does not apply to "taxes * * * laid with a political view" under the last clause of Article 15, *Oursler v. Tawes, supra* at 485-86; Niles, *Maryland Constitutional Law* 32-33 (1915); Lewis, *The Tax Articles of the Maryland Declaration of Rights,* 13 Md. L. Rev. 83, 110-11 (1953).

One of the more enigmatic facets of this case upon which neither of the parties relies is that by Chapter 656, § 1 of the Laws of 1968, Art. 81, § 280 (c) (which enumerates the items which are to be subtracted by an individual taxpayer from federal adjusted gross income for purposes of determining the base on which Maryland income tax is to be computed) was amended by providing for the subtraction of the following:

"* * * (6) For taxable years beginning after December 31, 1968, the amount of capital gains included therein which was realized from the sale, exchange or other disposition of property

amendment which would have permitted the imposition of a graduated income tax, which failed of passage at the election of 8 November 1938. These doubts would seem to have been dissipated, *Oursler v. Tawes,* 178 Md. 471, 484, 13 A. 2d 763 (1940), to which reference is made in the opinion. *See also* 40 Op. Att'y Gen. 470 (1955).

prior to January 1, 1967, which was not includable in 'gross income' under § 280 (A) of Article 81 of Annotated Code of Maryland in effect on the date of realization of said gain or gains."

Section 2 of the same Law provided, "[t]hat all provisions of this Act, being clarification of the intent of Chapter 142, Acts of 1967, or of prior law shall apply to all taxable years ending after December 31, 1966."

In the immediately succeeding Session of the General Assembly, Chapter 376 of the Laws of 1969 repealed and re-enacted Art. 81, § 280 (c), eliminating the provision of Chapter 656 of the Laws of 1968 quoted above, and provided that the 1969 Act would take effect on 1 July 1969.

Whatever may have been the purpose of this maneuver, it would seem palpably clear that it was the legislative intent that capital gains should be included in the base on which Maryland income tax was to be paid. This was the conclusion reached by the Attorney General:

"When it enacted Chapter 142, the State Legislature deliberately and intentionally pronounced a doctrine of conformance between the State income tax law and the federal income tax law. In so doing, it adopted the federal base for determining gross income, and it included capital gains and losses taxed as under federal laws, but at State rates. This is clearly established by the 'Report of the Committee on Taxation and Fiscal Reform' (February 1, 1967), which Committee was appointed by Governor-Elect Agnew on December 7, 1966 to present the implementing legislation for consideration by the General Assembly at its 1967 Session." 52 Op. Att'y Gen. 451, 452 (1967).

We now turn to a consideration of the several contentions made by the Katzenbergs.

(i)

"The application of the tax to these installment agreements is within none of the recognized exceptions to the constitutional rule of non-retroactivity."

In *Comptroller v. Glenn L. Martin Co.*, 216 Md. 235, 140 A. 2d 288 (1958), we had occasion to consider the validity of Chapter 3 of the Laws of 1957, purporting to make retroactive to 1947 an amendment to the sales and use tax acts which had the effect of subjecting to such taxes certain facilities purchased by the Martin Company in 1951-1954 under agreements which required immediate resale to the federal government. There, while we struck down the challenged statute because it was designed to tax transactions which had been completed long before the tax was in existence, relying on *Jones v. Gordy*, 169 Md. 173, 180 A. 272 (1935), we concluded, after a careful review of the cases, that a tax is not necessarily invalid simply because it is retroactive, *Diamond Match Co. v. State Tax Comm.*, 175 Md. 234, 200 A. 365 (1938); *Leser v. Wagner*, 120 Md. 671, 87 A. 1040 (1913), *aff'd sub nom. Wagner v. Baltimore*, 239 U. S. 207, 36 S. Ct. 66, 60 L. Ed. 230 (1915).

The Katzenbergs make much of the fact that the transactions which were completed in 1962, 1963 and 1964 fail to meet the "recent transaction" test applied in *Welch v. Henry,* 305 U. S. 134, 59 S. Ct. 121, 83 L. Ed. 87 (1938) and *Cooper v. United States*, 280 U. S. 409, 50 S. Ct. 164, 74 L. Ed. 516 (1930). This test, however, is clearly inapplicable here. First of all, the argument overlooks the new ingredient which the Katzenbergs themselves introduced when they elected to be paid in installments rather than in cash and thus chose to spread the recognition of their capital gain, and the payment of the federal income tax imposed on that gain, over a period of years. Secondly, it is not the 1962-1964 sales, but the 1967-1968 profits which the Act reaches, *City National Bank of Clinton v. Iowa State Tax Comm.*, 251 Ia.

603, 102 N.W.2d 381 (1960). The Act proposes to fix the income tax to be paid by a resident individual as a percentage of the adjusted gross income reported for federal tax purposes in years from and after 1 January 1967. The State's adoption of the federal definition of income does not constitute a delegation of legislative authority, *Underwood Typewriter Co. v. Chamberlain*, 94 Conn. 47, 108 A. 154 (1919), *aff'd*, 254 U. S. 113, 41 S. Ct. 45, 65 L. Ed. 165 (1920).

The argument that a State capital gains tax was not within the Katzenbergs' contemplation at the time they made the sale is equally unpersuasive. Maryland had an income tax at the time, and the Katzenbergs knew, or should have known, that the circumstance that capital gains were not taxed was no more than an exemption, *City National Bank of Clinton v. Iowa State Tax Comm.*, *supra*.

(ii)

"The tax may not constitutionally be applied to receipts of consideration and realizations of gain which took place years previous to its enactment."

As we understand this argument, it is in essence that the gain was realized when the notes in question were accepted by the Katzenbergs, and that the imposition of the Maryland tax on the proceeds collected in satisfaction of the notes is tantamount to the imposition of a tax on the collection of a debt.

We do not see it quite that way. Under our view, the existence of a capital gain was realized when the sales were made (assuming the notes were paid or could be disposed of), but the Katzenbergs preferred to defer the recognition of the gain for federal tax purposes until the time when and if the notes were paid or otherwise disposed of. It was the deferral of some part of this recognition until the years 1967 and 1968, when the Maryland Act was fully operative which brought the

gains recognized in those years within the scope of the Act.

For some time past, Pennsylvania and New York have measured corporate income taxes as a percentage of income developed by federal income tax returns, and decisions of the courts of those states are highly persuasive. In *Commonwealth v. Electrolux Corp.*, 362 Pa. 333, 67 A. 2d 105 (1949), the Supreme Court of Pennsylvania affirmed on the opinion of the lower court the imposition of a state tax on the net income of a corporation defined by statute as that "returned to, and ascertained by the Federal Government * * *". In that case, Electrolux had kept its books on an installment basis through the year 1939, recognizing as income only that part of sales profits which was attributable to installment payments received in the tax year. Electrolux sought and received the permission of the Commissioner of Internal Revenue to adopt an accrual method of accounting commencing in 1940, but the Commissioner's consent was conditioned on an agreement by Electrolux to include in its 1940 return all profits not theretofore returned on uncollected installments. Electrolux resisted the inclusion of its unrealized profits for purposes of the Pennsylvania tax, using arguments similar to those advanced here. The court held that since the unrealized profits formed a part of income for federal tax purposes, they were subject to the Pennsylvania tax. A similar result had been reached in respect of the deductibility of losses in *Commonwealth v. Warner Bros. Theatres, Inc.*, 345 Pa. 270, 27 A. 2d 62 (1942).

*Ebling Co. v. Graves*, 259 App. Div. 427, 20 N.Y.S.2d 123 (1940), *aff'd without opinion*, 284 N. Y. 689, 30 N.E.2d 726 (1940) raised a similar issue and similar arguments. Ebling was engaged in the real estate business, and from 1922 to 1929 had been taxed as a real estate corporation, the tax imposed by New York law being measured by the amount of capital employed and dividends declared. In 1923 and again in 1926, Ebling had

made sales of real estate on an installment basis. In 1930, it elected to be taxed as a business corporation under New York law. In that year, it included in its federal income tax return the profit attributable to the final payments it received in satisfaction of the mortgages on the properties sold seven and four years previously. An effort to exclude the payments from the figure on which New York income tax was imposed was unavailing, the court holding that net income reached by the state tax was that reported for federal tax purposes.

In *Garlin v. Murphy*, 51 Misc. 2d 477, 273 N.Y.S.2d 374 (1966) the Supreme Court, Albany County, concluded that the holder of stock in a corporation which had elected to be taxed under sub-chapter S of the Internal Revenue Code, 26 U.S.C. § 1371 *et seq.*, must return as adjusted gross income for purposes of the New York income tax his proportionate share of the corporation's undistributed profits for the tax year. The Court reasoned that this was so because the constitutional prohibition against taxing undistributed profits must be read in the light of the constitutional authority to impose taxes on income as developed by the federal tax returns.

*Electrolux* and *Ebling* must be sharply distinguished from the cases relied on by this Court in *Comptroller v. Glenn L. Martin Co., supra* and here by the Katzenbergs in support of their contention that the Act has a retroactive effect which is constitutionally impermissible. These cases were *Commonwealth v. Budd Co.*, 379 Pa. 159, 108 A. 2d 563 (1954) ; *Lacidem Realty Corp. v. Graves*, 288 N. Y. 354, 43 N.E.2d 440 (1942), and *People ex rel. Beck v. Graves*, 280 N. Y. 405, 21 N.E.2d 371 (1939). *Budd* was the converse of *Electrolux*. There, the Pennsylvania Supreme Court struck down as impermissibly retroactive a 1947 attempt to modify the state corporate income tax law by prohibiting the carry-back of 1946 operating losses to 1944, as permitted under the Internal Revenue Act of 1942, on the ground that the Pennsylvania tax had consistently been applied to income "re-

turned to, and ascertained by the Federal Government * * *".

*Lacidem* involved facts much like the *Martin* case, since the New York Legislature was held to have attempted to impose an unconstitutional tax when it sought by a statute passed in 1941 to make retroactive to 1937 a tax on property owners who sub-metered electricity. *Graves* struck down a 1935 statute which sought to tax income from foreign real estate retroactively to 1919. All of these cases can be distinguished on the ground that an impermissible attempt was made to give an unreasonable or arbitrary retroactive effect to an existing law. This is pointed up by the fact that in *Budd,* the Supreme Court of Pennsylvania distinguished and reaffirmed the *Electrolux* and *Warner Bros.* decisions.

### (iii)

"Chapter 142 is unconstitutionally arbitrary if construed to make Maryland tax liability depend on exercise of reporting options, years previously, under a different taxing scheme, rather than on the substance of transactions."

The thrust of this argument is that the inequality of treatment accorded taxpayers who do and do not elect to report capital gains on an installment basis makes the tax imposed by the Act arbitrary and discriminatory and thus unconstitutional. The Katzenbergs, in support of this argument, refer us to *Blaustein v. State Tax Commission,* 176 Md. 423, 4 A. 2d 861 (1939) which struck down as unconstitutionally discriminatory Chapter 302 of the Laws of 1935, which attempted to impose a tax of 6% on income derived from trusts created by residents of Maryland who placed the trust assets in the hands of non-resident trustees, but imposed no such tax on income derived from trust assets in the hands of resident trustees.

It seems to us that the State has the better of this argument when it says that the Act uses as a base an in-

dividual taxpayer's adjusted gross income reported for federal income tax purposes, with certain additions and subtractions. The Act is not directed at payments received from installment sales before the date of its enactment. Neither does it purport to be a tax on capital gains as such or a tax on installment payments as such. It is rather a tax measured by the yardstick of income reported for federal tax purposes, whether capital gains be reflected in this figure or not. This is by no means the discrimination identified in *Blaustein v. State Tax Commission, supra* at 429, as "taxing one group of persons * * * without including others who are similarly situated". Impermissible discrimination is spawned not by reasonable classification but by arbitrary distinctions between persons in the same class.

(iv)

"Any retroactive capital gains tax would constitute a direct tax on property rather than an excise on income and would offend the uniformity provisions of Article 15 of the Maryland Declaration of Rights."

To accept this argument requires us to close the gap between taxes on income, to which the uniformity requirement of Article 15 of the Declaration of Rights was held not to apply by *Oursler v. Tawes, supra,* and taxes on property, to which the uniformity requirement does apply. The Katzenbergs would bridge this void by arguing that accumulations of income become property and that an increase in the value of an asset represents either an accumulation of income or the increase in the value of a capital asset, which is a property right.

Appealing as this argument may be, it overlooks a basic element: that the whole thrust of the Maryland Act is to impose a tax on the amount determined under the Internal Revenue Code as the adjusted gross income of an individual or the taxable income of a corporation. This is a formula or yardstick objectively derived which

initially takes no account of the source, nature or composition of the funds; it is simply a figure developed by the federal return.

Attempts to draw analogies from the federal cases offer little help, for as we pointed out in *Oursler v. Tawes, supra* there is a wide disparity between state and federal power in this area. The State's power to tax is a basic attribute of sovereignty, and Article 15 of the Declaration of Rights is not a grant of such power, but rather a limitation upon it. No similar power rested in the government of the United States, which is the reason why it was necessary to adopt the 16th Amendment to the Constitution in order to permit the passage of valid federal income tax laws and why draftsmen have taken particular care not to extend the reach of federal legislation before 1 March 1913. The State is subject to no such limitation, *compare City National Bank of Clinton v. Iowa State Tax Comm., supra with MacLaughlin v. Alliance Ins. Co.,* 286 U. S. 244, 52 S. Ct. 538, 76 L. Ed. 1083 (1932).

(v)

"The Act can and must be construed to avoid the grave constitutional problems presented by it."

Here again, the argument would have us go behind the simple mandate of the Maryland Act, and enter the thicket of cases interpreting the federal income tax law —an exercise which we deem both unnecessary and futile. It is undoubtedly true that the General Assembly, had it seen fit to do so, could have imposed a tax on a taxpayer's gross income, without considering the source from which it came, whether it be earnings, investment income or profits realized from the sale of capital assets, and without granting exemptions, allowing deductions or permitting any other adjustments. If it could validly do this, and we think it could, there is no reason to doubt that it could select some other figure, objectively arrived at, upon which the tax could be based, *Tawes v. Strouse,* 182 Md. 508, 512-13, 35 A. 2d 233 (1943). It did this

when it chose to base the tax on the figures for adjusted gross income and taxable income, as developed by the federal returns.

*Judgments affirmed; costs to be paid by appellants.*