## Commonwealth *v.* Scott Paper Company, Appellant.

Argued November 22, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Thomas V. Lefevre,* with him *Samuel C. Harry, William M. Goldstein,* and *Morgan, Lewis & Bockius,* for appellant.

*Edward T. Baker,* Deputy Attorney General, with him *Edward Friedman,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, May 3, 1967:

This is an appeal by Scott Paper Company (Scott) in connection with its Pennsylvania corporate net income tax for the calendar year 1955. During that year Scott, a major producer of paper products, cut various quantities of timber owned by it and located in states outside of Pennsylvania. This cut timber had a fair market value on January 1, 1955, of $5,128,136; and all of it had been held by Scott for more than six months prior to January 1, 1955. Of this cut timber Scott used in its own business a quantity valued at $3,272,923. The remaining timber, valued at $1,855,213, was sold by Scott to other persons for a total price of $3,390,022.

Under specific provisions of the Federal Internal Revenue Code, Scott realized a capital gain of $4,414,021 on the cutting of this timber.[1] Section 631(a) of the Code gives to a taxpayer an election to consider timber cut by it during the year either for sale to others or for use in its own business as a "sale or exchange" of such timber. Section 1231(a) of the Code states that if gains on sales or exchanges of property used in a taxpayer's trade or business exceed the losses from such sales or exchanges during the year, these gains and losses shall be considered long-term in nature. Finally, §1231(b)(2) rounds out this trail of artificial tax concepts by stating that the phrase "property used in the [taxpayer's] trade or business" in §1231(a) shall include timber covered by §631. By this labyrinthine route a cutting of timber for use in one's own business may be transformed into a long-term capital gain subject to the attendant tax benefits

---

[1] This gain was computed by deducting the "cost" (actually, the adjusted basis for depletion) of this timber from the above-noted fair market value. The amount of receipts arising from the timber sold to others are irrelevant to this computation.

applicable to such form of income for federal tax purposes. Internal Revenue Code of 1954, §1201.

In its 1955 federal income tax report Scott made the election allowed by §631(a) and showed the above gain as "net long-term capital gain" and so included it in federal taxable income. In its Pennsylvania corporate net income tax report it allocated all of this gain outside of Pennsylvania in accordance with the provision of §2 of the Corporate Net Income Tax Act which states that gains realized from the sale or exchange of tangible capital assets situated outside of Pennsylvania shall be allocated entirely outside of Pennsylvania.

In settling Scott's tax, however, the state refused to allocate this amount in accordance with the above provision. Instead, it treated the $4,414,021 as ordinary income subject to the regular three-fraction allocation formula, thereby diverting part of this income (and the tax thereon) to Pennsylvania.

Scott appealed,[2] and the court below divided the income into two categories. As to the gain arising from the cutting by Scott of timber for use in its own business, the court disallowed the specific allocation outside of Pennsylvania, presumably on the ground that there was no sale or exchange. As to the remaining gain—that arising from the cutting of timber later sold to others—the court held there was a sale or exchange of a tangible capital asset and allowed the outside allocation. In reaching each of these conclusions, however, the lower court rejected Scott's argument that the characterization of the transaction for federal tax purposes controlled the state treatment. Instead, it held that the matter was one solely governed by state law, being a problem of allocation rather than one of

---

[2] The state cross-appealed, but the issues raised by it are not before us on this appeal.

computation of taxable income. Only the latter, it said, was controlled by federal concepts.

Scott appealed to this Court from the adverse ruling on the timber used by it in its business. No appeal has been taken by the Commonwealth with respect to the lower court's allowance of an outside allocation for gain on the sold timber.

Scott relies heavily in this appeal on our recent decision in *Commonwealth v. General Refractories Co.,* 417 Pa. 153, 207 A. 2d 833 (1965), a case in which we dealt with the deduction granted corporations under the Corporate Net Income Tax Act for dividends received from other corporations. The problem there stemmed from Pennsylvania's allowance of a 100% deduction while the Federal Code only provided for an 85% deduction in computing taxable income. Because of this a special state deduction had to be taken after federal taxable income was computed. We rejected the State's argument that simply because the deduction was made "after" taxable income was determined, the state was free to apply its own ideas regarding what was or was not a dividend. In dismissing this "before" or "after" test, we stated the correct rule: ". . . it is whether or not the Corporate Net Income Tax Act requires that the deduction be taken by reference to federal standards or state concepts (if, in fact, there is a difference between them)." 417 Pa. 153, 162, 207 A. 2d 833, 837.

We reaffirm this principle. The question in each case cannot be answered by some automatic reference to a "before taxable income or after taxable income" test. Rather, the meaning of the Corporate Net Income Tax Act (which may, as in the *General Refractories* case, or may not require reference to federal concepts) must be determined in the context of the problem involved.

Similarly, we find no merit in the Commonwealth's and lower court's attempted distinction between the *General Refractories* case and this one. That distinction was based upon the presence in the Corporate Net Income Tax Act of a specific reference allowing a deduction for dividends to the extent they are included in "taxable income as returned to and ascertained by the Federal Government" and the absence of any similar reference regarding capital gains. But the quoted language was only added to the C.N.I. Act in 1955 in order to accommodate the 100% dividend deduction policy of that Act to a 1954 change in the Federal Code. It represented no change in the meaning of the Act from the time of its inception as, in our *General Refractories* opinion, we noted. Therefore, the specific reference to Federal taxable income with respect to dividends was not vital to that decision and is of no importance in determining the present issue.

Simply reiterating our adherence to the basic principle of the *General Refractories* case (as Scott urges) and rejecting the State's distinction between that case and this (again, as Scott urges) is hardly dispositive of the case in Scott's favor, however. Here, too, as in *General Refractories,* we must look at the interpretative aids: The language of the C.N.I. Act, the history of the allocation provision and, if any, the administrative practices of the State.

Scott argues that the language of the C.N.I. Act is so similar to the language of the Federal Code that the legislature must have intended to base the State allocation on the Federal concept. In fact, Scott says the use and history of the phrase "gain from the sale or exchange of capital assets" is so peculiarly federal that no other interpretation is possible. We are considerably less certain of this than is Scott, however.

Neither the federal statutory income tax provisions of 1913, 38 Stat. 166, nor the Revenue Act of 1916, 39

Stat. 756, contained any language whatsoever dealing specially with the sale of capital assets. The Revenue Act of 1918, §202(a), 40 Stat. 1060, did use the phrase "gain derived or loss sustained from the sale or other disposition of property," but this use was only in a general section regarding the computation of the amount of gain includible in the income of individuals. There was still no special tax treatment for capital transactions.

The Revenue Act of 1921, §206(b), 42 Stat. 233, for the first time provided special alternative tax treatment for capital gains but only for individuals.[3] Section 206(a), 42 Stat. 232, defined capital gain as taxable gain from the "sale or exchange of capital assets." Here, then, for the first time, the familiar federal treatment, so common today, is found.

The first appearance of this phraseology in Pennsylvania tax law appears in the emergency profits tax Act of June 28, 1923, P. L. 876, 878. The provision in that Act allocated capital gains (for corporations transacting business outside of Pennsylvania) as follows:

"Section 3 . . . (a) Gains realized from the sale of capital assets, if such assets consist of intangible property, or if they consist of real estate, tangible or personal property, situated in the Commonwealth, shall be allocated to this Commonwealth. (b) Gains realized from the sale of capital assets, if such assets consist of real estate or tangible personal property situated outside of the Commonwealth, shall not be allocated in any part to this Commonwealth."

What is most striking about this language is not any similarity to the recently enacted Federal Revenue

---

[3] It was not until passage of the Revenue Act of 1942, 56 Stat. 798, in fact, that corporations were given the alternative of treating capital gains in a fashion different from ordinary income. Id. §150, 56 Stat. 843.

Act of 1921, but its almost complete identification with a Massachusetts Act of 1919 imposing an income tax on corporations. General Acts of 1919, Ch. 355. Section 6 of this Act, for example, provides for allocation of capital gains by domestic corporations[4] in the following language: "Gains realized from the sale of capital assets shall, if such assets consisted of intangible property, be determined to be income taxable under this act; but if such assets consisted of real estate or tangible personal property the gains realized from the sale thereof shall be apportioned to the states in which such property is situated."

This provision soon came to be rewritten in form until it provided for allocation as follows: "Gains realized from the sale of capital assets, if such assets consist of intangible property. or if they consist of real estate or tangible personal property situated in the commonwealth, shall be allocated to this commonwealth. Gains received from the sale of capital assets, if such assets consist of real estate or tangible personal property situated outside the commonwealth, shall not be allocated in any part to this commonwealth."[5]

Compare this to the wording of the Pennsylvania Corporate Net Income Tax Act as it was originally enacted in 1935:

"Section 2. . . . 2. . . . (a) Gains realized from the sale of capital assets, if such assets consist of real estate or tangible personal property situated in the Commonwealth, shall be allocated to this Commonwealth. (b) Gains realized from the sale of capital assets, if

---

[4] Foreign corporations included such gains only if from real estate or tangible personal property situated within Massachusetts. General Acts of 1919, Ch. 355, §19.

[5] See General Laws of Massachuetts, Tercentenary Edition (1932), Ch. 63, §37. This provision remained substantially the same until extensive changes in substance were made in 1966. See General Acts of 1966, Ch. 698, §§57 and 58.

such assets consist of real estate or tangible personal property situated outside of the Commonwealth, shall not be allocated in any part to this Commonwealth."

In light of this background we are not disposed to agree with Scott that the Pennsylvania statute clearly was written with both eyes on the Federal tax laws. It is equally, if not more, reasonable to conclude that the language of our capital gains provision was derived by the legislature from a concept of capital gains allocation of which the Massachusetts statute is a leading example. History, therefore, is far from compelling in Scott's favor.

Similarly, we find no clear history of administrative practice here such as was stipulated by the parties in the *General Refractories* case. Scott refers to a recent ruling of the Department of Revenue known as Taxing Memorandum No. 56 which ties the *amount* of allocable capital gain to the amount recognized as capital gain by the Federal Government in the application of §§1245 and 1250 of the Internal Revenue Code to transactions of the taxpayer and requires the federally denominated "ordinary gain" to be allocated as ordinary income. This matter is not before us, of course; but we find it difficult to understand how, *under the Corporate Net Income Tax Act,* gain from an admitted sale or exchange of an admitted capital asset, can be so divided. If this be so, the administrative memorandum is wrong, and our conclusion here regarding the independence of the State's determination of what is or is not capital gain subject to allocation is reinforced.

We agree with Scott that such an approach creates more difficulties and uncertainties in the administration of Pennsylvania's Tax laws, but this is a matter for the legislature to correct if it so desires. We believe that the language of the C.N.I. Act and the history of this language do not evidence a legislative in-

tent to deny to the Commonwealth the right to make its own determination of what constitutes the sale or exchange of a capital asset giving rise to gain allocable as stated by the Act. While this determination may parallel the federal one in most cases, it is not automatically governed thereby but must be based on Pennsylvania's own decision as to what is a capital asset and what is a sale or exchange.

Therefore, we turn to a consideration of whether the transaction in question here involved the sale or exchange of a capital asset. We have no difficulty in concluding with Scott and the lower court that the timber in question was a capital asset in Scott's hands, but we cannot find the requisite "sale or exchange" in a cutting for one's own use.[6] Taken in their ordinary sense, these words are not laden with ambiguities. Both denote transfers in one way or another. Here, no transfer occurred. Therefore, we must reject Scott's claim and sustain the Commonwealth's refusal to allow a specific allocation for the gain in question.

The court below ordered the matter remanded to the Department of Revenue for resettlement. This was improper. State tax appeals are heard de novo by the lower court, §1104 of The Fiscal Code, Act of April 9, 1929, P. L. 343, 72 P.S. §1104; and it is incumbent upon that court to enter a final judgment determining the tax liability. If a resettlement must be

---

[6] In fact, as if to illustrate Scott's argument regarding the difficulties inherent in these matters, we note that the capital gain produced from the timber sold by Scott to others was not a gain resulting from a sale or exchange either. It arose, also, from the cutting of the timber; and the subsequent sale by Scott only affected Scott's ordinary income. See Internal Revenue Code of 1954, §631(a) and Regs. §1.631-1(e). However, since the Commonwealth did not appeal from that part of the lower court's decision allowing Scott to allocate this part of the gain, we need not review this point further.

made and the court has insufficient information with which to make one, its only proper recourse is to direct the parties to prepare and submit a computation upon which the court can base its judgment. Hence, the proceeding must be remanded to the lower court with a direction that it have such a computation prepared and submitted to it for the entry by it of a final judgment.

The judgment of the court below is modified as stated and, as so modified, affirmed and remanded for further proceedings consistent with this opinion.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I concur with the opinion of the majority insofar as it affirms the substantive decision of the court below. I dissent, however, from that part of the majority's ruling which appears to limit the choice of procedures open to the court below in disposing of this litigation. The majority in my view suggests neither reason nor authority for its view that the procedure it requires the court to adopt should be the exclusive method of completing this litigation, and I fail to see why the court below could not adopt the procedure it followed, the procedure outlined by the majority or any other proper alternative in disposing of this case.

The majority says, in effect, that the court below was incorrect in choosing to remit the computation of Scott's tax liability to the Department of Revenue. This conclusion the majority purports to base on the exclusive power of the court below to enter a final judgment after a hearing de novo. I submit that the majority is proceeding upon a misunderstanding. The action of the court below in remitting the computation to the Department for resettlement in no way detracts from or interferes with its power to enter a final judgment and in furtherance thereof to hold any addition-

al hearings it deems necessary. Indeed, for the court below to do otherwise than to remit to the Department for resettlement would involve it in the mechanics of an intricate and detailed computation for which it, like this Court, is probably not particularly well equipped. Thus, where, as in the instant case, the computation to be made entails accounting rather than legal questions, I think the court below acted both permissibly and wisely in remitting to the Department. Thus the procedural ruling of the majority's opinion not only lacks any basis in authority, but also in reason.

Mr. Chief Justice BELL and Mr. Justice EAGEN join in this concurring and dissenting opinion.