COMPTROLLER OF THE TREASURY *v.* THE
CHESAPEAKE CORPORATION OF VIRGINIA

[No. 434, September Term, 1982.]

*Decided April 8, 1983.*

The cause was argued before MOYLAN and MASON, JJ., and BASIL A. THOMAS, Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Gerald Langbaum, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *John K. Barry, Assistant Attorney General,* on the brief, for appellant.

*E. Stephen Derby,* with whom were *Karen L. Myers Zauner* and *Piper & Marbury* on the brief, for appellee.

THOMAS, J., delivered the opinion of the Court.

In 1977, the Comptroller of the Treasury, Income Tax Division (Comptroller), assessed a deficiency against the Chesapeake Corporation of Virginia (Chesapeake) for three tax years in question. Chesapeake appealed to the Maryland Tax Court. The Tax Court concluded that the Comptroller was in error and vacated the assessment. After an appeal to the Baltimore City Court (Levin, J.), an order affirming the Tax Court's decision was issued. This appeal arises from that order. For the reasons stated we shall reverse.

I

The relevant facts are not in dispute. The Chesapeake Corporation is engaged in the forest products business, primarily in the manufacturing of paper board, brown paper, and market pulp at its major production facility located in West Point, Virginia. In connection with its manufacturing process, Cheaspeake also maintains a wood fiber procurement plant in Pocomoke City, Maryland.

The source of Chesapeake's raw material is timber located in Virginia, North Carolina, Delaware, and Maryland. Chesapeake obtains the timber from land which it owns in fee simple, from land to which it holds cutting rights, and from individuals who independently cut and sell timber.

Approximately seventy-five percent (75%) of the trees processed at the Pocomoke City facility come from timberland and cutting rights owned by Chesapeake. The remaining twenty-five percent (25%) is purchased from independent growers.

For federal income tax purposes, Chesapeake recognized taxable income from timber which it cut and sold under § 631 (b) of the Internal Revenue Code. (26 U.S.C.) (1964 ed.) However, as to timber which was cut and utilized in its manufacturing process, Chesapeake recognized a "hypothetical" gain permitted under I.R.C. § 631 (a).[1] Section 631 (a) allowed Chesapeake to treat the cutting of timber for use in its business "as a sale or exchange of such timber cut during such tax year" and accordingly afforded federal capital gains tax treatment.[2]

Chesapeake's § 631 (a) and § 631 (b) gains were reported to Maryland and subject to corporate income taxation under Article 81, § 280A of the Annotated Code of Maryland. The corporation's § 631 (b) gains, resulting from an actual sale of timber, were allocated to Maryland or outside of Maryland based on the location of the timber cut pursuant to Article 81, § 316 (b) 2 (A). Chesapeake's I.R.C. § 631 (a) gains, however, which were not generated by an actual sale or exchange of timber, were included in the corporation's

---

**1.** "If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber . . . shall be considered as a sale or exchange of such timber cut during such year." I.R.C. § 631 (a).

**2.** Section 1231 (a) of the Internal Revenue Code provides that "recognized gains on sales or exchanges of property used in the trade or business . . . shall be considered as gains and losses from sales or exchanges of capital assets held for more than one year." According to § 1231 (b) (2), "property used in the trade or business . . . includes timber . . . to which section 631 applies." Therefore, gains recognized by virtue of the § 631 (a) election are treated, for federal tax purposes, as gains from the sale of capital assets. For the tax years in dispute, the tax on Chesapeake's "net capital gain" was at a much lower rate than its regular income. *Compare* I.R.C. § 11 *with* § 1201. The term "net capital gain" is defined in § 1222 as "the excess of net long-term capital gain for the taxable year over the net short-term capital loss for such year." "Long-term capital gain" and "short-term capital loss" are defined in terms of a sale or exchange of a capital asset. I.R.C. §§ 1222 (2), 1222 (3).

general business income and apportioned to Maryland according to the three factor formula in § 316 (c).

The Income Tax Division of the Comptroller's office subsequently conducted an audit of Chesapeake's Maryland tax returns. An assessment of additional income was made for the tax years 1974, 1975, and 1976. This adjustment was due to the Comptroller's insistence that Chesapeake's federal 631 (a) "capital gains" had to be allocated to the situs state as "capital gains" under § 316 (b) 2 (A), rather than apportioned under § 316 (c) as general business income.

Chesapeake appealed the deficiency assessment to the Maryland Tax Court and argued that its § 631 (a) income should be apportioned because the gain was not produced by an actual sale of timber under § 316 (b) 2 (A). The Tax Court agreed and vacated the assessment. After an appeal by the Comptroller to the Baltimore City Court, the Tax Court's decision was affirmed.

The single issue on this appeal is whether Chesapeake's § 631 (a) income should be allocated under § 316 (b) 2 (A) because "capital gains" for federal income tax purposes are "capital gains" for Maryland income tax purposes or should its § 631 (a) gains be apportioned as general business income under § 316 (c) because an actual sale is required under § 316 (b) 2 (A).[3]

---

**3.** *"Capital gains* and losses from sales of tangible personal property are allocable to this State if . . . the property had a situs in this State *at the time of the sale. . . .* Md. Code Ann. art. 81, § 316 (b) 2 (A) (1980 Repl. Vol.) (emphasis added). Section 316 (c) of Article 81 provides:

"(c) *Business income.* — The remaining net income, hereinafter referred to as business income, shall be allocated to this State if the trade or business of the corporation is carried on wholly within this State, but if the trade or business of the corporation is carried on partly within and partly without this State so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State, shall be allocated to this State and any balance of the business income shall be allocated outside this State. *The portion of the business income derived from or reasonably attributable to the trade or business carried on within this State may be determined by a separate accounting where practicable, but never in the case of a unitary business; however, where separate accounting is neither allowable nor practicable the portion of the business income of the corporation allowable to this*

## II

This is a case of first impression in Maryland [4] calling for a construction of Article 81, § 316 (b) 2 (A). The section provides in pertinent part,

> "Capital gains and losses from sales of tangible personal property are allocable to this State if . . . the property had a situs in this State at the time of the sale."

Chesapeake contends that this provision requires an actual sale of timber to effect the tax consequences of its application. The Comptroller, on the other hand, argues that since Chesapeake elected to treat the cutting of timber as a sale or exchange under I.R.C. §631 (a) and receive preferential federal capital gains tax treatment, the corporation has recognized "capital gains" within the meaning of this section. We agree with the Comptroller.

In *Katzenberg v. Comptroller,* 263 Md. 189, 282 A.2d 465 (1971), certain taxpayers challenged the 1967 revision of the State income tax law. The Court of Appeals observed, quoting in part from an opinion of the Attorney General, that it was,

---

*State shall be determined in accordance with a three-factor formula of property, payroll and sales, in which each factor shall be given equal weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property."*

*Id.* at § 316 (c) (emphasis added).

4. It is appropriate that we delineate this Court's scope of review which appellee Chesapeake suggests is "severely limited." Comptroller v. Diebold, 279 Md. 401, 407, 369 A.2d 77, 81 (1977). Article 81, § 229 (o) provides that a decision of the Tax Court shall be affirmed by a circuit court or the Baltimore City Court "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. . . ." Where the factual context of a particular controversy is undisputed, the reviewing court is free to substitute its own judgment on questions of law. Department of Assessments and Taxation v. Glick, 47 Md. App. 150, 422 A.2d 34 (1980). As we stated earlier, the facts of the instant case are undisputed.

> "palpably clear that it was the legislative intent that capital gains should be included in the base on which Maryland income tax was to be paid. This was the conclusion reached by the Attorney General: 'when it enacted Chapter 142, *the State Legislature deliberately and intentionally pronounced a doctrine of conformance between the State income tax and the federal income tax law.* In doing so, it adopted the federal base for determining gross income, *and it included capital gains and losses taxed as under federal laws, but at State rates....*' 52 Opp. Att'y Gen. 451, 452 (1967)." [5]

*Id.* at 198, 282 A.2d at 470 (footnotes omitted) (emphasis added). Judge Singley, writing for the Court in *Katzenberg,* further emphasized Maryland's high degree of conformity to federal income tax law.

> "[T]he whole thrust of the Maryland [income tax] Act is to impose a tax on the amount determined under the Internal Revenue Code as the adjusted gross income of an individual or taxable income of a corporation. This is a formula or yardstick objectively derived which initially takes no account of the source, nature of composition of the funds; it is simply a figure developed by the federal return."

*Id.* at 204-205, 282 A.2d at 473. Maryland income tax law has consistently remained "inextricably keyed" to the Internal Revenue Code. *See Comptroller v. Diebold, Inc.,* 279 Md. 401, 408, 369 A.2d 77, 81 (1977) (*citing Marco Associates v. Comptroller,* 265 Md. 669, 674, 291 A.2d 489, 492 (1973); *Katzenberg, supra* at 204, 282 A.2d at 472). See also Article 81, §304 (a) which directs the Comptroller to "apply as far as practicable the administration and judicial

---

5. See the 'Report of the Committee on Taxation and Fiscal Reform", (February 1, 1967), which Committee was appointed by Governor-Elect Agnew on December 7, 1966 to present the implementing legislation for consideration by the General Assembly at its 1967 Session. The Committee included the Chairman of the Senate Finance Committee and the Chairman of the House Ways and Means Committee.

interpretations of the federal income tax law". Md. Code Ann. Art. 81, §304 (a) (1980 Repl. Vol.). Whereas federal law must enumerate and define items of income in a wide variety of factual situations, Maryland law, by virtue of its adoption of the federal law, need not.

Illustrative of this policy is the fact that the Internal Revenue Code provides definitions of numerous items which are to be taken into income, while such definitions are conspicuously absent in the Maryland income tax law. In Maryland the federal base is simply adopted. See Md. Code Ann. Art. 81, §§280 (a), 280A (a) (1980 Repl. Vol.). Consequently, various items such as capital losses, capital gains, and sales of property have not been specifically defined in Article 81. Therefore, an item appearing in a corporation's federal return as "taxable income" must be similarly reflected as "net income" in the corporation's Maryland return.[6]

As noted earlier, under I.R.C. §1231, the gain Chesapeake recognized for the cutting of timber, pursuant to the §631 (a) election, was treated as a gain from the sale or exchange of a capital asset. "Capital gains" and "capital losses" are defined in I.R.C. §1222 in terms of a "sale or exchange of a capital asset". Although the phrase "capital gains and losses" is repeatedly used in Article 81, §316 (b), it is never defined. Clearly the State legislature intended "capital gains and losses" under §316 (b) to have the same meaning as in the Internal Revenue Code. Accordingly, capital gain income under § 316 (b) 2 (A), including that derived from an I.R.C. § 631 (a) election, must be allocated to the situs state.

The Tax Court and Baltimore City Court appeared to have focused on the word "sale" appearing at the end of § 316 (b) 2 (A) and concluded that an actual sale was required. Our

---

6. I.R.C. §11 provides that "[a] tax is hereby imposed for each taxable year on the *taxable income* of every corporation. (Emphasis added). Under Maryland's Article 81, §288 a tax is levied on the *"net income* of every corporation". (Emphasis added). Furthermore, under Article 81, §208A (a), "The net income of a corporation shall be the taxable income of such taxpayer [corporation] as defined in the laws of the United States as amended from time to time . . . except as hereinafter modified."

reading of § 316 (b) 2 (A), however, does not require an actual sale, particularly in view of this State's policy of conformity to the Internal Revenue Code. Under an I.R.C. § 631 (a) election, *a sale or exchange of timber has occurred* insofar as implementing federal capital gains tax consequences. Chesapeake's characterization of the sale as "hypothetical" does not, therefore, in our view, diminish the applicability of § 316 (b) 2 (A).

Although this is a case of first impression in Maryland, appellant and appellee have cited only two other cases in which the precise question before this Court has been addressed by the high courts of other States. Our research too has revealed that only our neighboring states to the north and south have discussed this issue. Under factual circumstances analogous to the case at bar, the Supreme Court of Pennsylvania and the Supreme Court of Virginia reached opposite conclusions.

In *Commonwealth v. Scott Paper Co.,* 425 Pa. 444, 228 A.2d 904 (1967), the corporate taxpayer was a major producer of paper products which had cut various quantities of timber owned by it and located outside the State of Pennsylvania. The timber cut had a fair market value of over $5,000,000. A quantity of this timber, valued at over $3,000,000, was used in the corporation's business operations.

Scott realized a capital gain of $4,414,021 on the timber used in its own business pursuant to the election provision under I.R.C. §631 (a), §1231 (a), and §1231 (b); the gain was computed by deducting the cost of the timber (adjusted basis for depletion) from the fair market value. *Id.* 228 A.2d at 905. Scott's §631 (a) income was reported as "net long-term capital gain" and so included in its federal taxable income. *Id.*

In its Pennsylvania corporate net income tax report, Scott allocated all of this gain outside the State under §2 of the Pennsylvania's Corporate Net Income Tax Act. Section 2 provides that gains realized from the sale or exchange of tangible capital assets situated outside of Pennsylvania

shall be allocated entirely outside of Pennsylvania. 72 P.S. §3420b. The State, however, treated the $4,414,021 as ordinary income subject to a regular three-part apportionment formula. Thus, under the State's approach at least part of this income would be diverted to Pennsylvania for tax purposes.[7]

The Supreme Court of Pennsylvania agreed with the state taxing authority and held that the corporation's §631 (a) gains were to be apportioned to Pennsylvania rather than allocated outside the state. Justice Cohen, writing for the court, stated:

> "*[W]e are not disposed to agree with Scott that that Pennsylvania statute was clearly written with both eyes on the Federal laws.*
>
> * * *
>
> We believe that the language of the C.N.I. Act and the history of this language do not evidence a Legislative intent to deny the Commonwealth the right to make its own determination of what constitutes the sale or exchange of a capital asset giving rise to gain allocable as stated by the Act. While this determination may parallel the federal one in most cases, it is not automatically governed thereby but must be based on Pennsylvania's own decision as to what is a capital asset and what is a sale or exchange."

*Id.,* 228 A.2d at 908 (emphasis added). The Court made this decision although agreeing with the corporate taxpayer that "*such an approach creates more difficulties and uncertainties* in the administration of Pennsylvania tax

---

**7.** The positions taken by the State and the corporate taxpayer in *Scott* are opposite of the positions argued by the parties in the instant controversy.

laws, but this is a matter for the legislature to correct if it so desires." *Id.* (emphasis added).[8]

In *Department of Taxation v. Champion International Corp.,* 220 Va. 981, 265 S.E.2d 720 (1980), one of the corporate taxpayers, Champion, was a New York corporation that manufactured and sold paper and building materials. In Virginia, Champion owned and operated a manufacturing plant and warehouses, and it owned land from which it harvested timber. The income of the corporation in controversy, however, was derived almost entirely from the cutting of timber grown outside of Virginia. *Id.,* 265 S.E.2d at 722.

Champion, in 1972, reported to Virginia income from timber transactions as capital gains in the amount of $29,046,941, of which only $122 represented gains from timber cut in Virginia. The corporation allocated the capital gains according to the situs; $122 was allocated to Virginia and the remaining sums were allocated outside the state. Va. Code §58-151.039 (b) (1) (1974 Repl. Vol.).[9] Virginia's Department of Taxation conducted an audit and assessed a deficiency against Champion predicated upon its conclusion that all the income from timber transactions was apportionate and thereby subject to a three-factor formula rather than allocable.[10] *Id.* at § 58-151.041.

---

**8.** We note that under the statute considered by the Pennsylvania court in *Scott* that the tax on corporate income is imposed with reference to taxable income "returned to and ascertained by the Federal Government". 72 P.S. 3420b (a) and (b) (repealed and presently codified at 72 P.S. 7401 (Supp. 1982-83)).

**9.** "Capital gains and losses from sales or other disposition of tangible personal property are allocable to this State if (1) the property had a situs in this State at the time of the sale or other disposition...." Va. Code § 58-151.039 (b) (1) (1974 Repl. Vol.).

Va. Code Ann. §§ 58-151.038 through 58-151.040 were repealed in 1981. Prior to 1981, § 58-151.039 (b) closely resembled Article 81, § 316 (b) of the Maryland Annotated Code. Both statutes mandated the allocation of corporate capital gain income. In 1981, the Virginia statute was amended and now provides that the taxable income of a corporation shall be apportioned subject to a limited number of exceptions. Va. Code Ann. §§ 58-151.034 through 58-151.050:3 (1974 Repl. Vol., 1982 Cum.Supp.).

**10.** The positions taken by the state and corporate taxpayer in *Champion* are identical to the positions adopted in *Scott,* but opposite of those argued here.

Champion had elected to treat the cutting of timber for sale or for use in its trade or business as a sale or exchange of such timber pursuant to I.R.C. § 631 (a). Under I.R.C. § 1231 (a) and § 1231 (b) Champion reported its § 631 (a) income on its 1972 federal income tax return as capital gains. *Champion, supra,* 265 S.E.2d at 724. The Supreme Court of Virginia held that Champion's § 631 (a) income constituted allocable capital gains and cited § 58-151.01 (a) of the State code "conforming the Virginia income law to the laws of the United States relating to federal income taxes." [11] *Id.,* 265 S.E.2d at 725.

For several reasons we conclude that *Champion* is more persuasive in resolving the instant controversy than *Scott.* First, the pronouncements of the Court of Appeals in *Katzenberg, Marco Associates* and *Diebold, supra,* clearly indicate that Maryland has adopted and endorsed a "doctrine of conformance" between state and federal income tax law. 52 Op. Att'y Gen. 451, 452 (1967). Maryland income tax law is "inextricably keyed" to the Internal Revenue Code. *Diebold, supra.* Similarly, the Supreme Court of Virginia in *Champion* observed that a policy of "conforming the Virginia income tax law to the laws of the United States relating to federal income taxes" had been adopted. *Champion, supra,* 265 S.E.2d at 725. Secondly, both the Maryland and Virginia legislatures have enacted statutes declaring a policy of conformance with federal income tax law. *Compare* Md. Code Ann. Art. 81, § 304 (a) (1980 Repl. Vol.) *with* Va. Code § 58-151-01 (a) (1974 Repl. Vol.).

Finally, the approach adopted by the court in *Scott* is contrary to the doctrine articulated by this State's judicial, executive, and legislative branches. Unlike Pennsylvania, we are convinced that Maryland income tax laws were written "with both eyes on the federal tax laws". Furthermore, in finding that "capital gains" under the

---

11. "Any term used in this Chapter shall have the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required." Va. Code § 58-151-01 (a) (1974 Repl. Vol.).

federal tax system are "capital gains" under Md. Code Ann. Art. 81, § 316 (b), we avoid *Scott's* burdensome impact which the court admitted would "create[] more difficulties and uncertainties in the administration [of that State's] income tax laws". *Scott, supra,* 228 S.E.2d at 908. Our approach, consequently, will make the administration of Maryland income tax law easier from the standpoint of both the taxpayer and the Comptroller. We glean from *Scott* the court's uneasiness in conforming what it depicted as a complex package of federal "artificial tax concepts" to state income tax law. We, however, are not so constrained and reiterate the words of Judge Singley in *Katzenberg, supra* at 204-205, 282 A.2d at 473:

> "[T]he whole thrust of the Maryland [income tax] Act is to impose a tax on the amount determined under the Internal Revenue Code as the adjusted gross income of an individual or the taxable income of a corporation. This is a formula or yardstick objectively derived which initially takes no account of the source, nature, or composition of the funds; it is simply a figure developed by the federal return."

We hold that Chesapeake's I.R.C. §631 (a) capital gains income should be allocated as capital gains under Article 81, §316 (b) 2 (A) rather than apportioned as general business income under §316 (c).

*Judgment reversed; costs to be paid by appellee.*