**SYSTEMS & COMPUTER TECHNOL-
OGY CORPORATION, Petitioner**

v.

**COMMONWEALTH of Pennsylvania,
Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 12, 2011.
Decided April 18, 2012.

Richard C. Kariss, New York, NY, for petitioner.

Jonathan C. Edmunds, Deputy Attorney General, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and FRIEDMAN, Senior Judge.

OPINION BY President Judge LEADBETTER.[1]

Systems & Computer Technology Corporation (SCT) petitions to review the or-

1. This case was assigned to this opinion writ- er before she completed her term as President

der of the Board of Finance and Revenue that affirmed the Board of Appeals' resettlement of SCT's franchise tax liability for the taxable year 2005. In this appeal, the Court is asked to decide whether the "goodwill" recorded on SCT's 2005 balance sheet as an asset is includable in "the actual value" of its stock in its wholly owned subsidiary corporations. If so, SCT is eligible to compute its 2005 franchise tax liability utilizing the favorable "10% holding company apportionment" method under Section 602(e) of the Tax Reform Code of 1971 (Tax Reform Code), Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7602(e). Because we conclude that SCT met the definition of a holding company and was, therefore, eligible to utilize such tax computation method, we reverse.

The parties submitted a Stipulation of Facts (Stipulation) with numerous exhibits attached thereto pursuant to Rule 1571(f) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1571(f), which reveal the following relevant facts. SCT is a publicly traded Delaware corporation with its principal place of business in Malvern, Pennsylvania. SCT's activities consist of providing corporate oversight to its twenty-two wholly-owned subsidiary corporations.[2] Those subsidiary corporations either provided information technology solutions to colleges and universities in the form of software applications and services or held interests in other entities. On

February 12, 2004, SunGard Data Systems, Inc. (SunGard), an entity unrelated to SCT, acquired SCT and SCT's twenty-two subsidiary corporations.[3] Before and after the acquisition, SCT and its subsidiary corporations conducted similar activities.

In accordance with the Statement of Financial Accounting Standards No. 141, Business Combinations (2001) (FAS 141), published by the Financial Accounting Standards Board of the Financial Accounting Foundation, American Appraisal Associates, an independent third-party appraisal company, prepared a report on the values of SCT's tangible and intangible assets as of the February 12, 2004 acquisition. Based on the fair market values estimated in that report, SCT first allocated the price paid by SunGard for the acquisition to assets acquired and liabilities assumed (net assets) and then allocated the remainder of the acquisition price exceeding the fair market values of the net assets to goodwill, as required by FAS 141 (Exhibit A).[4] Stipulation, ¶ 8. This allocation, commonly referred to as a "purchase price allocation," is reflected on Schedule L ("Balance Sheets per Books") of SCT's federal income tax Form 1120 for the taxable year ending December 31, 2004 (Exhibit B). *Id.*

Similarly, on Schedule L (balance sheet) of *pro-forma* Form 1120 for the taxable

---

Judge on January 6, 2012.

**2.** A "subsidiary corporation" is "[a]ny corporation, a majority of the total issued and outstanding shares of voting stock of which are owned by the taxpayer corporation directly or through one or more intervening subsidiary corporations." Section 601(a) of the Tax Reform Code, 72 P.S. § 7601(a).

**3.** To effectuate the acquisition, SunGard formed an acquisition company, known as Schoolhouse Acquisition Corp. Inc. (SAC), that purchased the shares of SCT from SCT's

shareholders. After the acquisition, SAC was merged into SCT and ceased to exist.

**4.** *See* FAS 141, ¶ 35 ("[a]n acquiring entity shall allocate the cost of an acquired entity to the assets acquired and liabilities assumed based on their estimated fair values at date of acquisition"); and FAS 141, ¶ 43 ("[t]he excess of the cost of an acquired entity over the net of the amounts assigned to assets acquired and liabilities assumed shall be recognized as an asset referred to as goodwill").

year 2005 (Exhibit E), Line 13a ("Intangible assets"), SCT reported its intangible assets of $489,780,621, consisting of $847,727 for purchased software, $89,589,321 for acquired software, $108,454,887 for the customer base and *$290,888,686 for goodwill.* The purchased software, acquired software and customer base are "recognizable intangible property" under FAS 141. Stipulation, ¶ 9. The intangible assets reported on the 2005 balance sheet were consistent with their treatment on SCT's 2004 balance sheet and in accordance with the valuation study performed by the independent third-party following the 2004 acquisition. On Line 9 ("Other investments") of the 2005 balance sheet, SCT reported $237,954,339 as investments in its subsidiary corporations' stock, which was calculated by adding together its subsidiary corporations' capital stock and additional paid-in-capital accounts. Stipulation, ¶ 10.

Every "foreign entity" [5] must pay an annual franchise tax, which is "computed by multiplying each dollar of the capital stock value [6] B ... by the appropriate rate of tax." Section 602(b)(1) of the Tax Reform Code. The rate of the franchise tax for the taxable year ending December 31, 2005 was 5.99 mills. Section 602(h) of the Tax Reform Code. A holding company, however, may elect to compute a franchise tax "by applying the rate of tax ... to ten per cent of the capital stock value." Section 602(e) of the Tax Reform Code. This favorable method of tax computation is known as a "10% holding company apportionment." Section 601(a) of the Tax Reform Code, 72 P.S. § 7601(a), defines a holding company as:

> Any corporation (i) at least ninety per cent of the gross income of which for the taxable year is derived from dividends, interest, gains from the sale, exchange or other disposition of *stock or securities* and the rendition of management and administrative services to subsidiary corporations, and (ii) at least sixty per cent of *the actual value* of the total assets of which consists of *stock securities* [7] or indebtedness *of subsidiary corporations.*

5. A "foreign entity" is "[a] corporation organized by or under the laws of any jurisdiction other than the Commonwealth" which exercises privileges of (1) "[d]oing business in this Commonwealth," (2) "[c]arrying on activities in this Commonwealth," (3) "[h]aving capital or property employed or used in this Commonwealth" or (4) "[o]wning property in this Commonwealth." Section 601(a) of the Tax Reform Code.

6. The term "capital stock" is "[t]he capital stock, certificates, memberships and all other interests in a domestic or foreign entity." Section 601(a) of the Tax Reform Code. A "capital stock value" is computed pursuant to the following formula:

> [T]he product of one-half times the sum of the average net income capitalized at the rate of nine and one-half per cent plus seventy-five per cent of net worth, from which product shall be subtracted one hundred sixty thousand dollars ($160,000), the algebraic equivalent of which is (.5 X (average net income/.095 + (.75) (net worth)))-$160,000.
>
> *Id.*

7. Section 601(a) uses the phrase "stock or securities" in the first element of the definition (income test) but "stock securities" in the second element of the definition (asset test). In discussing the asset test in *Commonwealth v. Rosenbloom Finance Corp.*, 457 Pa. 496, 498, 325 A.2d 907, 908 (1974), the Pennsylvania Supreme Court treated the words "stock" and "securities" as two separate concepts by inserting a comma between the two, as in the income test. A "stock" is "[a] proportional part of a corporation's capital represented by the number of equal units (or shares) owned, and granting the holder the right to participate in the company's general management and to share in its net profits or earnings." Black's Law Dictionary 1456 (8th ed.2004). A "security" is, *inter alia,* "[a]n instrument that evidences the holder's ownership rights in a firm (e.g., a stock)." *Id.* at 1384.

[Emphasis and footnote added.]

The first and second elements of the above definition are referred to as "the income test" and "the asset test," respectively. It is undisputed that SCT met the income test. Only the asset test is at issue here.

In a PA Corporate Tax Report for the taxable year 2005 (Exhibit D) filed with the Department of Revenue (Department), SCT reported $137,447[8] as its franchise tax liability, utilizing the 10% holding company apportionment method. Stipulation, ¶ 20. With the approval of the Auditor General, the Department settled SCT's 2005 franchise tax liability to $1,071,381. Exhibit F. SCT timely filed a petition for resettlement with the Board of Appeals. The Board rejected SCT's computation of its franchise tax liability under the 10% holding company apportionment but granted partial relief, resettling SCT's franchise tax liability to $811,795. Exhibit H. SCT filed a petition to review the resettlement with the Board of Finance and Revenue that denied the petition and affirmed the resettlement. SCT's appeal to this Court followed.

■■■ To meet the asset test for a holding company, SCT was required to establish that "the *actual value* of SCT's stock securities of subsidiary corporations divided by [the actual value of] SCT's total assets equals at least sixty percent." Stipulation, ¶ 19 (emphasis added). The parties further stipulate:

If this Court determines that the goodwill SCT recorded as an asset on its balance sheet as a result of its acquisi-

tion by SDS [SunGard] is properly includable in the actual value of SCT's stock securities of subsidiary corporations, then SCT meets the sixty percent [of the asset] test, qualifies for holding company apportionment and the Tax as calculated on its original return is correct.

Stipulation, ¶ 20. If the goodwill recorded on SCT's 2005 balance sheet is not includable in the actual value of SCT's stock in its subsidiary corporations, but instead is a directly owned asset of SCT, then SCT fails to meet the asset test, and its 2005 franchise tax liability, as resettled by the Board of Appeals, is correct. Stipulation, ¶ 21.[9]

■■ The Commonwealth urges this Court to adopt what it characterizes as a "balance sheet analysis." Commonwealth's Brief at 11. Under the Commonwealth's approach, SCT's investments in the subsidiary corporations, as reported on the 2005 balance sheet (Schedule L, Line 9 of Form 1120), would be the actual value of its stock in those corporations. *Id.* at 11 n. 3. Because the goodwill value was not included on Line 9, but instead was included on Line 13a (intangible assets), the Commonwealth would attribute the value of goodwill to SCT directly, not to the subsidiaries. The Commonwealth claims that its approach "allows for a consistent method of evaluation by the Department and imposes no additional reporting requirements on a taxpayer." *Id.*

SCT counters that its investments reported on the balance sheet were merely

---

**8.** The copy of SCT's 2005 PA Corporate Tax Report attached to the Stipulation shows that the reported amount of the franchise tax was $137,442, not $137,447 as stated in the Stipulation.

**9.** This Court reviews the decision of the Board of Finance and Revenue *de novo. Hilltop Props. Assocs. Ltd. P'ship v. Common-*

*wealth,* 768 A.2d 1189 (Pa.Cmwlth.2001). A stipulation of facts submitted by the parties is binding upon the parties and the Court. *Kelleher v. Commonwealth,* 704 A.2d 729 (Pa. Cmwlth.1997). The Court, however, draws its own legal conclusions from the stipulation. *Id.*

the historical cost of the subsidiary corporations and did not approximate the actual value of their stock in the subsidiaries. SCT's Reply Brief at 3. SCT argues that the price paid by SunGard for the 2004 acquisition in the arm's-length transaction was the actual value of SCT and its subsidiary corporations and that because SCT's subsidiary corporations, not SCT, operated the valuable business of providing information technology solutions to the colleges and universities, the goodwill recorded on its balance sheet as an asset must be included in the actual value of the subsidiary corporations' stock securities, and not as a separate asset held directly by SCT.

■ The term "actual value" is not defined by the Tax Reform Code, but is defined by the regulations as a "[c]ash value." 61 Pa.Code § 155.22. The courts have also defined an actual value as a market value or a fair market value for tax assessment purposes. *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals,* 530 Pa. 451, 610 A.2d 1 (1992); *Gilmour Props. v. Bd. of Assessment Appeals of Somerset County,* 873 A.2d 64 (Pa.Cmwlth.2005). A fair market value is " 'the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell. . . .' " *F & M Schaeffer Brewing,* 530 Pa. at 457, 610 A.2d at 3 [quoting *Buhl Found. v. Bd. of Prop. Assessment, Appeals & Review,* 407 Pa. 567, 570, 180 A.2d 900, 902 (1962) ].

■ Goodwill is "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase." Black's Law Dictionary 715 (8th ed.2004). The components of goodwill include, *inter alia,* the following: "[t]he excess of *the fair values over the book values* of the acquired entity's net assets at the date of acquisition;" "[t]he *fair value* of the 'going-concern' element of the acquired entity's ex-

isting business," which "represents the ability of the established business to earn a higher rate of return on an assembled collection of net assets than would be expected if those net assets had to be acquired separately;" and, "[t]he *fair value* of the expected synergies and other benefits from combining the acquiring entity's and acquired entity's net assets and businesses." FAS 141, Appendix B102 (emphasis added). Goodwill is "an intangible asset that is only realized at the time a business is sold." *Nelson v. State Bd. of Veterinary Med.,* 938 A.2d 1163, 1173 (Pa. Cmwlth.2007).

It is undisputed that SunGard acquired SCT and SCT's subsidiary corporations in an arm's-length transaction. Consequently, the price paid by SunGard for the acquisition was the fair market or actual value of SCT and the subsidiary corporations. Pursuant to FAS 141, the purchase price exceeding the fair market value of the assets acquired and liabilities assumed (net assets), as determined by the independent appraiser, was allocated to the goodwill. Therefore, the amount of goodwill recorded on the balance sheet also represented its fair market or actual value as of the acquisition. As stipulated by the parties, it was SCT's wholly owned subsidiary corporations that engaged in the business of providing software applications and services to the colleges and universities or held interests in other entities. SCT's activities were limited to providing corporate oversight to its subsidiary corporations. Hence, the actual value of goodwill realized at the time of the acquisition was attributable to SCT's subsidiary corporations and properly includable in the actual value of the stock securities of those corporations for the purpose of the asset test.

The Commonwealth's "balance sheet analysis" approach, equating SCT's investments in the subsidiary corporations on

the balance sheet with the actual value of the subsidiary corporation's stock securities, is similar to the position taken by the taxpayer in *Commonwealth v. Butler County National Bank*, 376 Pa. 66, 101 A.2d 699 (1954), which involved a statute that imposed a tax on the actual value of the capital stock of banks and savings institutions. In the tax report filed with the Department, the taxpayer bank claimed a total valuation of its capital stock, surplus and undivided profits based on their book values. The Department resettled the tax liability by making an upward adjustment based on "the difference between the aggregate *cost* of [the taxpayer bank's] securities, as reflected by the books of the bank, and the aggregate *market* value of the same securities." *Id.* at 68, 101 A.2d at 700 (emphasis in original).

On appeal, the Pennsylvania Supreme Court upheld the resettlement, stating:

> [T]he Act lays the tax on the "actual value" of the bank shares. That provision, the appellant entirely disregards and asserts that the capital stock paid in, the surplus and undivided profits of a bank are to be determined *according to the books of the bank* and that the share valuation, so ascertained, is what the Act was intended to tax. The appellant deduces this argument from the fact that in the field of accounting a corporation's capital stock paid in, surplus and undivided profits added together and divided by the number of corporate shares outstanding gives the book value of the shares. That, of course, is true. But the Act does not restrict the Commonwealth's fiscal officers to what the bank's books show nor does it prohibit them from ascertaining independently what the capital stock paid in, the surplus and undivided profits of a taxpayer bank *actually* amount to. It may readily be conceded that the appellant bank used the most approved accounting practices in carrying *on its books* its investment securities at cost B ..., but the fact still remains that the appraisal of such investments at their *market* value contributes to a more truly *actual* valuation of the bank's capital shares. And, that is what the Act expressly taxes. Sound corporate accounting practices ... are not designed to show the *actual* worth of a bank's shares but rather their *rock-bottom* value, in short, the most conservative estimate possible.

*Id.* at 69–70, 101 A.2d at 700 (emphasis in original).

As in *Butler County National Bank*, the Commonwealth's "balance sheet analysis" approach, which treats the taxpayer's investments in the subsidiary corporations reported on the balance sheet as the actual value of those corporations' stock securities, totally ignores the cardinal rule of statutory construction that clear and unambiguous statutory language may not be disregarded. Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b); *Luther P. Miller, Inc. v. Underground Storage Tank Indemnification Bd.*, 965 A.2d 398 (Pa.Cmwlth.2009). The cost of SCT's investments in the subsidiary corporations' stock securities, as reflected on its books, is not the same as their actual value. *Butler County Nat'l Bank.* The Commonwealth's position, if adopted, would result in disregarding and "distort[ing] the otherwise clear language" in the asset test. *Commonwealth v. Alcoa Props., Inc.*, 440 Pa. 42, 47, 269 A.2d 748, 750 (1970).

As our Supreme Court has stated: "Taxation is, after all, a practical matter and [tax statutes] must be given a reasonable construction in the '[business] context of the [specific] problem involved.' ... We must therefore read the statutory [lan-

guage] ... B so that it reaches a reasonable result in light of business accounting and operating practices." *See Fisher Controls Co. v. Commonwealth,* 476 Pa. 119, 124, 381 A.2d 1253, 1256 (1977) [quoting *Commonwealth v. Scott Paper Co.,* 425 Pa. 444, 448, 228 A.2d 904, 906 (1967)] (other citations omitted). We believe that the statutory interpretation urged by SCT better satisfies this standard than does the interpretation proffered by the Commonwealth.

In conclusion, SCT met the asset test for a holding company and was eligible to compute its franchise tax liability for the 2005 taxable year under the 10% holding company apportionment. Therefore, SCT correctly calculated its 2005 franchise tax liability in the original return filed with the Department, and the order of the Board of Finance and Revenue affirming the resettlement by the Board of Appeals is reversed.

### ORDER

AND NOW, this 18th day of April, 2012, the order of the Board of Finance and Revenue in the above-captioned matter is REVERSED. The Chief Clerk shall enter judgment in favor of Systems & Computer Technology Corporation and against the Commonwealth, unless exceptions are filed within thirty days after entry of this order, pursuant to Rule 1571(i) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1571(i).